[Crim. No. 21529. Dec. 17, 1981.]

In re GORDON ROBERT HALL on Habeas Corpus.

COUNSEL

Richard V. Cruz, Richard V. Siggins and Gerald F. Uelmen for Petitioner.

Esther Valadez, Jaime M. Cervantes and David A. Luna as Amici Curiae on behalf of Petitioner.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Respondent.

OPINION

**MOSK, J.**—Petitioner Gordon Robert Hall seeks a writ of habeas corpus following his conviction of first degree murder and related charges, and imposition of a sentence of life imprisonment.

The events leading to the judgment may be summarized as follows:

In the late evening of February 25, 1978, Victor Lara arrived at his mother's residence in Pomona and discovered there had been an argument during which his cousin Gilbert Rubio had pushed Victor's mother. Rubio had just left to take Victor's adopted brother, Jesse Ortiz, who was a postman, to his home in nearby Duarte. Victor and his other adopted brother, Daniel Lara, followed them in Victor's car. They overtook Rubio's car on Buena Vista Street in Duarte, and Rubio pulled over. The three brothers got out of the cars, and Jesse told the others to leave Rubio alone. As they were arguing, Rubio drove away.

Subsequently a gray 1969 Chevrolet Impala passed by slowly, and one of its two occupants shouted something. As Daniel and Victor attempted to persuade Jesse to get into their car, the Chevrolet stopped approximately half a block away. The occupants, later described by the Laras as 18- to 20-year-old Chicanos, 5 feet 7 inches to 5 feet 8 inches tall, got out, walked toward the brothers, and asked where they were from. One of the brothers replied that they were from Pomona, that they were involved in a family dispute, and that the newcomers should

mind their own business. One of the latter, who wore a green trench-coat, then pulled out a small handgun and fired three shots "past" the brothers. The brothers assumed the gunman was firing blanks and began walking toward him.

Around this time two additional cars, one of which the Laras described as a white 1963 Chevrolet, pulled up across the street. Several young Chicanos emerged, and one of them ran to the scene and began to wrestle with Daniel. The gunman fired several more shots, slightly wounding Victor and Daniel, and killing Jesse with a single bullet in the head. The gunman, his companion, and the new arrivals immediately ran back to their respective vehicles and drove off.

Daniel called the police, who arrived shortly thereafter and took descriptions of the assailants and their vehicle. Within minutes the police located, approximately three blocks from the shooting, what appeared to be the gunman's car parked on the lawn of a residence at which a large party was in progress. The officers secured the premises and sought to detain all 30 to 40 teenage participants, but several tried to flee by jumping out of a window at the back of the house.

Petitioner, who was then 16 years old and 5 feet 1 inch tall, was one of those who attempted to leave the area. An officer traced his footsteps in the wet grass and found him wearing no shirt and hiding in some bushes or tall grass approximately a block away. He was then hand-cuffed, taken back to the residence, and placed in a patrol car parked near the front yard.

After brief medical treatment, the Lara brothers were brought to the scene and, while seated together in the back of a patrol car, viewed the Chicano males from the party in several four- to six-man lineups. Thereafter petitioner, still handcuffed and barechested, was escorted near or directly to the car in which the Laras sat, and the brothers identified him as the killer.

At the preliminary hearing and again at trial, the Laras identified petitioner as the gunman. By way of defense, petitioner testified that he was at the party all evening except when he left briefly in a Volkswagen to purchase beer with his friend, Max Romero, who corroborated the alibi. He also explained that he fled the police because his presence at the party violated the terms of his juvenile probation, which had resulted from his prior involvement in a graffiti-painting incident.

The events leading to the present petition for habeas corpus may also be summarized:

After trial petitioner's family and friends retained new counsel who, together with them, conducted an independent investigation of the case. Through these efforts new evidence was developed which led the two homicide detectives who had investigated the case before trial to suspect that the wrong person had been convicted. They decided to reopen the case, and their findings left one of them convinced of petitioner's innocence and the other with strong doubts about his guilt. The case also came to the attention of the district's state senator, H. L. Richardson, who lent his support to petitioner's cause.

On the basis of the evidence newly discovered by these means, as well as other evidence found to have been available at the time of trial but not introduced by petitioner's former counsel, a petition for habeas corpus was filed in this court. We issued an order to show cause, and subsequently appointed a referee to take evidence and make findings of fact responsive to the following questions raised by the petition:

(1) What new evidence, if any, has been discovered?

(2) Should such evidence, if any, be credited?

(3) Would such evidence, if credited, undermine the entire case of the prosecution?

(4) Would such evidence, if credited, establish that false evidence, substantially material or probative on the issue of guilt, was introduced against petitioner at trial?

(5) Did petitioner's trial counsel inadequately represent him (i.e., did counsel fail to act in a manner to be expected of a reasonably competent attorney acting as a diligent advocate) either

(a) by failing to challenge the identification procedures employed by the police on the night of the crimes and arrest, or

(b) by failing to diligently investigate petitioner's case prior to trial and seek out witnesses on his behalf?

(6) If either (5)(a) or (5)(b) is answered in the affirmative, did trial counsel's failure to act deprive petitioner of a potentially meritorious defense?

After a full adversary hearing at which 31 witnesses testified, including 19 on behalf of petitioner, the referee prepared a long and thorough report of his findings of fact. As will appeal,. in this report the referee recited a wide range of newly discovered evidence, and found that such evidence should be credited and did undermine the entire case of the prosecution; he further found that petitioner's trial counsel failed to act as a reasonably competent attorney in both respects listed in our order of reference, and that such failure deprived. petitioner of a potentially meritorious defense. By way of conclusion, the referee recommended that the petition for habeas corpus be granted. In light of the referee's findings and recommendation, we thereafter granted petitioner's application for release on his own recognizance pending final disposition of the petition for habeas corpus.

■ Our standard of review in these circumstances is well settled: "A referee's findings of fact are, of course, not binding on this court, and we may reach a different conclusion on an independent examination of the evidence produced at the hearing he conducts even where the evidence is conflicting. [Citation.] However, where the findings are supported by 'ample, credible evidence' [citation] or 'substantial evidence' [citation] they are entitled to great weight [citations] because of the referee's 'opportunity to observe the demeanor of the witnesses and weigh their statements in connection with their manner on the stand . . .' [citation]." (*In re Branch* (1969) 70 Cal.2d 200, 203, fn. 1 [74 Cal.Rptr. 238, 449 P.2d 174].) After an appropriate review of the record we hold there is substantial evidence to support the referee's findings, and agree with his conclusion that the writ should issue.[1]

---

[1]The petition also contained allegations that trial counsel acted incompetently when he failed to challenge the legality of petitioner's arrest and transport to the scene of the field identification (see *People* v. *Harris* (1975) 15 Cal.3d 384, 389-392 [124 Cal.Rptr. 536, 540 P.2d 632]), and that the district attorney engaged in "post-trial suppression of evidence" when he reneged on a plea bargain with a witness who as a result was allegedly unwilling to testify on petitioner's behalf (cf. *In re Ferguson* (1971) 5 Cal.3d 525 [96 Cal.Rptr. 594, 487 P.2d 1234]). Because the facts on which these contentions rest were undisputed, no evidentiary hearing was necessary to determine them. Moreover, because we find relief justified on the grounds addressed by the referee, we do not reach these additional issues.

## I.

As mentioned, the referee found that petitioner had sustained his burden of proving there is newly discovered and credible evidence which undermines the entire case of the prosecution. If supported, such a finding warrants relief by habeas corpus. (*In re Lindley* (1947) 29 Cal.2d 709, 723, 724 [177 P.2d 918].) We proceed to an examination of the evidence on this point, which may be grouped conveniently into several categories.

## A.

The Lara brothers were the only eyewitnesses to the crime who either placed petitioner at the scene or implicated him as the gunman. As such, they obviously were the key prosecution witnesses. After trial, however, the brothers expressly recanted their testimony both in writing and under oath at the habeas corpus hearing: they confessed that their identification was erroneous, that petitioner had not been at the scene, and that one Oscar Sanchez was the actual gunman. Victor Lara testified that he originally thought petitioner was the gunman, but has since become convinced of petitioner's innocence because he has had the opportunity to more carefully view Sanchez who he now believes is the killer, and because of the substantial discrepancy between petitioner's height and the height of the gunman. Victor also signed, under penalty of perjury, a declaration stating in part, "I never got a good look at the person who shot my brother. I was mistaken when I later identified [petitioner] Hall as the killer . . . ." Daniel Lara testified in the same fashion, explaining his erroneous identification by the fact that he was distraught about his brother's death and careless in deciding which of the Duarte youths were responsible.

The Attorney General contends, as he did before the referee, that these recantations must be discredited because they are not in fact the result of the revision of inaccurate recollections, but of pressure brought to bear on the witnesses by new defense counsel and by pervasive rumors in the community that the wrong person had been convicted. Both brothers admit they have been influenced by what they have heard, as well as by what they now believe they saw at the scene. But Victor specifically stated that he was *not* changing his testimony because of newspaper accounts of the story or because of new defense counsel's efforts. Furthermore, as the Attorney General concedes, there is no evidence whatever of ulterior motive or dishonesty on the part of either

brother. And as will appear, the suggestive conditions under which they originally identified petitioner add credibility to their confession of mistake.

Although we routinely view recantations with suspicion (*In re Weber* (1974) 11 Cal.3d 703, 722, 724 [114 Cal.Rptr. 429, 523 P.2d 229]), we find implausible the suggestion that both Laras confessed error in their sworn identifications of the murderer of their brother only because others now believe they erred. If they remained as certain as they originally were that they saw petitioner shoot their brother, they would have no reason now to come to petitioner's defense. The referee painstakingly weighed their testimony, and found that the retraction should be credited.[2] Because the question of credibility is largely for the referee (*In re Weber, supra*, at p. 724; *In re Wright* (1978) 78 Cal.App.3d 788, 801 [144 Cal.Rptr. 535], and cases cited), and because we are not tempted by the Attorney General's invitation to speculate as to the subconscious forces that may have contributed to these witnesses' reassessment of their view of the crime, we sustain the referee's finding on this question.

Petitioner also presents the testimony of a previously undiscovered eyewitness to the murder. This woman, a resident of another East Los Angeles community, testified that on the night of the crimes she was in the back seat of a dark-colored Chevrolet, one of the two cars that arrived on the scene while the five youths were arguing and fighting. She identified the two assailants as Alfred Reyes and Oscar Sanchez, both acquaintances of hers, and testified that she believes Sanchez fired the gun. She also testified that she did not know petitioner personally but knew who he was, and she categorically stated that he was not at the scene of the crime. Her recollection of the events generally matches that of the Laras, except that she asserts she did not notice whether any of her companions or the occupants of the white Chevrolet ran to the scene.

Reyes also testified at the hearing. He unfolded a bizarre explanation of the event, first denying any involvement, then alleging that he was

[2]Thus the findings recite that "the referee has given serious consideration as to whether the recantation is as a result of a manufactured story or the result of a concentrated brainwashing program. The referee had an opportunity to closely observe and scrutinize both Laras as they testified." After such scrutiny, the referee declared he is "satisfied that their testimony before the referee is not designed or intended to mislead or misrepresent the situation as they see it after having given it some thought and discussion among themselves."

knocked unconscious by an unknown assailant when he stopped to assist a phantom motorist in distress. He claims that the next thing he recalls is Oscar Sanchez driving the car away from the scene while he recuperated in the passenger seat. Reyes' effort to explain his presence at the scene while avoiding any implication of complicity on his part is patently unbelievable, but it is noteworthy that he identified Sanchez rather than petitioner as the person who commandeered his car after the shooting, and that he said nothing to implicate petitioner.

Another witness testified that he shared a jail cell with Sanchez, who was incarcerated in connection with a different matter after petitioner was convicted. This man was from out of state and apparently had no previous contact with or knowledge of petitioner, Sanchez, or anyone else connected with the present case. He testified that on at least three occasions he overheard Sanchez speaking with friends in jail about a murder he had committed for which another person was convicted. Although the witness' recollection of details was affected by drug-related memory loss and by his decision not to write anything down for fear of discovery, he was able to recall that Sanchez said the crime occurred in February 1978, that the victim was a postman, and that Sanchez was in a car and used a gun. He also testified that Sanchez seemed proud of his deed but concerned that he might still be prosecuted, apparently because of newspaper accounts of renewed efforts to establish petitioner's innocence. The witness stated that despite fears for his own safety he located petitioner's attorney and volunteered to testify as to Sanchez's statements because "there was just the way he did it. Like he was cold —cold-hearted. Just like it was, you know, nothing. That left the impression on me. And so I wanted to come forward on it, do anything I could to help. ... [¶] ... I feel I'm doing something that is worthy. You know—if I had a brother, I would want someone to do it for him."

At trial, the prosecution presented only one eyewitness other than the Laras. Linda Couture, an employee of a small pizza shop on Buena Vista near the scene of the shooting, testified at trial that she saw the incident, and thought Alfred Reyes, a former coemployee, was one of the two men who initially approached the three brothers. She also testified that the assailants drove off in what appeared to be Reyes' gray Chevrolet, although again she was not positive. She could not identify the other assailant.

At the habeas corpus hearing, however, Ms. Couture testified that she had been afraid to tell the whole truth at trial. She was in fact cer-

tain that Reyes was there, and certain that it was his car; her equivocal testimony at trial stemmed from fear of reprisal by Reyes and his friends. At the time of trial she was three months pregnant and had miscarried three times before. Her anxiety prompted her to move from Duarte after the trial, and as a result of the move she is now less reluctant to testify truthfully.

■ Petitioner offers additional testimony by Ms. Couture, as well as several other witnesses, that tends to exonerate him and implicate Sanchez. It appears, however, that this information either was known or could have been discovered by diligent investigation before trial. It would therefore not qualify as "newly discovered evidence" for the purpose of a motion for new trial. (*People* v. *Williams* (1962) 57 Cal.2d 263, 270 [18 Cal.Rptr. 729, 368 P.2d 353].) Yet, in *In re Branch* (1969) *supra*, 70 Cal.2d 200, 214, we considered similar evidence to be relevant to the new-evidence ground of habeas corpus relief, reasoning that "it is so fundamentally unfair for an innocent person to be incarcerated that he should not be denied relief simply because of his failure at trial to present exculpatory evidence." Justice Peters' language should not be read to imply that a petitioner may routinely use habeas corpus proceedings to reassess unsuccessful tactical decisions at trial; the expressed concern is for the *innocent* defendant. Accordingly, a habeas corpus petitioner must first present newly discovered evidence that raises doubt about his guilt; once this is done, he may introduce "any evidence not presented to the trial court and which is not merely cumulative in relation to evidence which *was* presented at trial" (*ibid.*) insofar as it assists in establishing his innocence. Being mindful of the convicted defendant's opportunity to challenge his attorney's competence in failing to investigate or present obviously exculpatory evidence (see *People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1]; *In re Williams* (1969) 1 Cal.3d 168, 175 [81 Cal.Rptr. 784, 460 P.2d 984]), we perceive no danger that this interpretation will deprive any wrongfully convicted person of the opportunity to establish his innocence.

Because petitioner has clearly made such a threshold showing of new evidence raising doubt about his guilt, we now consider the additional evidence of innocence that was known or could have been discovered before trial.

Ms. Couture revealed that she had never spoken to defense counsel or seen petitioner before trial. Because she did not look at petitioner close-

ly during trial, she did not notice his diminutive stature. She now testifies that she is absolutely certain petitioner was not involved in the shooting, because she distinctly remembers that Reyes and his companion were approximately the same height, and Reyes is roughly six inches taller than petitioner.

In sum, of the five eyewitnesses who testified at the habeas corpus hearing, three asserted that Sanchez was the gunman, one stated that petitioner definitely was not the gunman although she did not know who was, and all five denied having seen petitioner during the incident. Such evidence is amply sufficient to undermine the entire case of the prosecution, because it eviscerates the key trial testimony against petitioner and clearly implicates a different culprit. (Cf. *People v. Williams, supra,* 57 Cal.2d 263, 271-272; *In re Branch, supra,* 70 Cal.2d 200, 214-215.) We next recount briefly the substantial additional evidence that supports the same conclusion, and reserve discussion of the relevant details for our examination of the contention that trial counsel was incompetent in failing to discover most of the following evidence, or to present any of it. (Part III, *post.*)

First, a former girl friend of Sanchez testified that he telephoned her before the preliminary hearing and described the killing, for which he claimed responsibility. Second, two witnesses testified that Reyes returned to the party after the police left and stated to several persons that Sanchez had "blown it" by shooting someone. Third, petitioner asserts that while he and Sanchez were being transported to the preliminary hearing, Sanchez confessed that he committed the crime. Fourth, Sanchez appeared at petitioner's residence shortly before trial and, in the presence of petitioner, his mother, his brother, his sister, and a family friend, threatened to blow up his house if he "ratted" on Sanchez, or if he refused to "take the rap." Fifth, Sanchez apparently made a separate threat to Max Romero for deciding to testify on petitioner's behalf. Sixth, several persons attending the party saw Sanchez there; two observed him waving a small handgun in the air, some noticed him leave with Reyes in the latter's car, and at least one recalled that he wore a green trenchcoat fitting the description of the coat worn by the gunman.

### B.

At the hearing, six new witnesses confirmed various aspects of petitioner's alibi. But because this evidence merely reinforces petitioner's

and Romero's trial testimony, which was partially corroborated at that time by Penny Rochelle, a prosecution witness, the proferred evidence is cumulative and may not be considered "new." (See *In re Branch, supra,* 70 Cal.2d 200, 214.)

## C.

Several witnesses to the identification procedure revealed details theretofore unknown to the defense that, if believed, would contribute substantially to an attack on the procedure as unduly suggestive. The investigating officers, however, continued to deny many of the allegations of suggestive conduct and comments, and the referee made no ruling on the credibility of the competing versions. For the purpose of the new-evidence contention, therefore, these statements create only a conflict as to how the investigation was conducted. We find therefore they are inadequate to prove official impropriety, and reserve further analysis of them for our discussion of trial counsel's incompetence.

We do, however, have serious doubts as to the propriety of a plea bargain entered into by the district attorney with the witness Reyes, who faced charges for an independent crime. The bargain in the other case called for Reyes to render no assistance to this petitioner's cause without discussing the matter with the district attorney. While the referee made no findings on this subject, our review of the evidence suggests such an unusual arrangement is subject to an interpretation that it was designed to thwart discovery of the truth. Fortunately, it did not actually do so.

## D.

The Attorney General makes two general objections to the referee's finding that the new evidence reviewed above undermines the entire case of the prosecution. First, he argues that because the habeas corpus hearing was closed, the evidence adduced is inherently unreliable and cannot be given significant consideration.[3] We acknowledge that the environment in which a witness testifies should be taken into account in weighing his credibility, and that it is arguable a closed hearing may reduce a witness' inhibition against testifying falsely. But

---

[3]Prior to the hearing, petitioner requested that the proceedings be closed to the public and the press because certain of his witnesses were reluctant to testify in open court for fear of reprisals. The hearing was ordered closed.

the referee was careful to weigh the credibility of the witnesses in light of the Attorney General's objection, and he concluded that the new evidence, taken as a whole, should nevertheless be credited. We find, as did the referee, that there are sufficient indicia of truth in the evidence to outweigh the possibility of perjury that now concerns the Attorney General.[4]

Second, the Attorney General complains that the new evidence "does not point unerringly to [petitioner's] innocence." (*In re Lindley* (1947) *supra*, 29 Cal.2d 709, 724.) He asserts that even if Sanchez pulled the trigger, petitioner may have been otherwise involved in the crime. But the prosecution proceeded solely on the theory that petitioner was the gunman, not that he was one of the bystanders and not that he may have aided or abetted others in committing the crime. The only evidence of petitioner's involvement was the assertion by the Laras that he fired the fatal shots; no evidence whatever was adduced at trial or at the hearing placing petitioner at the scene of the crime in any other capacity.

In *In re Weber, supra*, 11 Cal.3d at page 724, we reiterated that newly discovered evidence will not undermine the entire case of the prosecution unless it is conclusive and "points unerringly to innocence." In so holding, however, we did not intend to impose either the hypertechnical requirement that each bit of prosecutorial evidence be specifically refuted, or the virtually impossible burden of proving there is no conceivable basis on which the prosecution might have succeeded. It would be unconscionable to deny relief if a petitioner conclusively established his innocence without directly refuting every minute item of the prosecution's proof, or if a petitioner utterly destroyed the theory on which the People relied without rebutting all other possible scenarios which, *if* they had been presented at trial, might have tended to support a verdict of guilt. (Cf. *People* v. *Superior Court* (1972) 7 Cal.3d 186, 198-199 [101 Cal.Rptr. 837, 496 P.2d 1205], and cases cited.) The nullification of the Lara brothers' testimony by their retractions and by the evidence amassed subsequent to trial completely destroys *this* case against petitioner. No more need be shown to warrant relief.

---

[4]We note that the Attorney General expressed no such concern when he argued to us in a recent case that prosecutors should have the right to request closed preliminary hearings when *their* witnesses are reluctant to testify for fear of public exposure or reprisal. (See *People* v. *Pompa-Ortiz* (1980) 27 Cal.3d 519 [165 Cal.Rptr. 851, 612 P.2d 941].)

## II.

■ The referee also found that petitioner had not sustained his burden of proving that "false evidence" was introduced against him at trial. In so ruling, however, the referee apparently failed to recognize that the 1975 amendment of Penal Code section 1473 revised and expanded the category of prosecution evidence subject to challenge on this ground. The new law requires only that the evidence be "false" and "substantially material or probative on the issue of guilt or punishment" (*id.*, subd. (b)(1)); there is no longer any obligation to show that the testimony was perjured or that the prosecutor or his agents were aware of the impropriety. (*In re Wright, supra*, 78 Cal.App.3d 788, 807-808.)

In this case, the trial testimony of the Laras identifying petitioner as the killer apparently was false, albeit unintentionally so. As it was virtually the only damning evidence against petitioner, that testimony clearly satisfies the statute's test of materiality. Accordingly, despite the referee's finding we hold that false evidence was introduced against petitioner, and that issuance of the writ is justified on that ground as well.

## III.

After petitioner's arrest, his family retained as his attorney John H. Whyte, who was admitted to the bar in 1957 and in recent years was certified as a criminal law specialist. Whyte agreed to represent petitioner for $10,000, a sum the family members raised by selling their home. ■ The record amply supports the referee's findings that petitioner was denied constitutionally adequate representation of counsel by Whyte's failure to adequately investigate the case and to challenge the identification procedures utilized by the police.

The bulk of Whyte's problems can be traced to his investigative method. He did not hire an investigator to assist him, and offered several reasons for that decision. First, he observed that Duarte is a small Mexican-American community, and implied that its residents would be hostile to an outside investigator. Second, he noted that most of the potential witnesses in this case were juveniles whose willingness to cooperate and whose reliability were uncertain. Third, he observed that after Sanchez was "kicked loose" at the preliminary hearing, he "strutted around and threatened everybody." Whyte stated in conclusion, "I wasn't satisfied [that] if I had the best investigator on earth they [*sic*]

could find anything." Furthermore, Whyte believed that investigators use too much time and sometimes "botch cases"; he could not recall when he had last hired one. Instead, therefore, he chose to rely on petitioner's family as "listening posts" in the community, despite their complete lack of investigative training. He reasoned that they would be better able than any outsider to uncover information, and that he could adequately pursue any leads they provided.

The decision to forego a trained investigator is not necessarily an indication of incompetence; it is conceivable that an attorney could adequately prepare for trial utilizing the tactic chosen by Whyte. But if an attorney representing a defendant in a murder case relies on amateurs to gather defense information, he should be particularly vigilant in training and supervising them, and in following up the leads they develop. Instead, Whyte systematically ignored the information provided by petitioner's family and failed to interview or subpoena numerous witnesses expressly made known to him. By his own admission, he attempted to obtain only one witness through his technique, and was unsuccessful in that instance.[5] Whyte thereby rendered futile the efforts of petitioner and his family in supplying lists of potential witnesses and in reporting other relevant information they had acquired.

Whyte also relied on the police investigators, assertedly because he had a "good rapport" with them, and because they were focusing primarily on evidence linking Oscar Sanchez and Alfred Reyes to the crime. But his reliance on the police to conduct an adequate investigation for the defense was inappropriate in this case for three reasons.

Although the state and its representatives have no interest in convicting innocent persons, it would be unrealistic to assume that once charges have been levelled against a specific individual the police will search as zealously for exculpatory evidence as they will for information that might lead to conviction. The witnesses interviewed, the questions asked, and the leads pursued will all be unavoidably affected by the investigator's close relationship with the prosecution. Furthermore, Whyte was well aware that many of the witnesses were part of a community openly suspicious of and hostile toward representatives of law enforce-

---

[5]Even that attempt was half-hearted. Whyte did not interview the witness, and relied on petitioner's mother to serve the subpoena on him on the morning of the trial. When her effort failed because the witness' father challenged her authority, Whyte took no further action to obtain the witness, who was apparently willing to corroborate petitioner's alibi.

ment; he should therefore have realized that an attorney or investigator representing the interests of a member of that community would be more likely to secure the confidence and cooperation of prospective witnesses.

Finally, Whyte was under an independent obligation to determine the usefulness of the dozens of witnesses located by police investigation, most of whom were friends and acquaintances of petitioner. The investigating officers were obviously not acting as defense counsel's agents. Accordingly, his adoption of their results without attempting to contact any but two or three of the potential defense witnesses was an inexcusable delegation of his duty.

Perhaps the most blatant violation of Whyte's obligation to his client was his practice of turning over unconfirmed information about potential defense witnesses *to the police* for further investigation. Whyte insisted at the hearing that his failure to personally investigate the witnesses supplied by petitioner and his family resulted in no prejudice, because the information was often turned over to the investigating officers for further inquiry. Far from justifying Whyte's failure, however, this practice was fraught with the danger of violating the attorney-client privilege and of unwittingly directing the police to incriminating evidence. Although there is no proof that petitioner was actually prejudiced by this practice, counsel could not have known what the witnesses would tell the police about his client, as he had made no independent attempt to ascertain what they knew.

We have observed that "There is a risk of 'second-guessing' trial counsel after the event. Nonetheless, while acknowledging the wide latitude and discretion necessarily vested in trial counsel in the area of tactics and strategy, we stress that the exercise of that discretion must be a reasonable and informed one in the light of the facts and options reasonably apparent to counsel at the time of trial, and founded upon reasonable investigation and preparation." (*People* v. *Frierson* (1979) 25 Cal.3d 142, 166 [158 Cal.Rptr. 281, 599 P.2d 587].) Whyte's failure to investigate cannot be considered reasonable under the circumstances, nor can his resultant choice of defense strategy be justified as an informed tactical decision. As will appear, petitioner demonstrates that many material witnesses could have been discovered by diligent investigation, and that the loss of their testimony resulted in the deprivation of at least three potentially meritorious defenses. (See *People* v. *Pope, su-*

*pra*, 23 Cal.3d 412, 425; cf. *People* v. *Hill* (1969) 70 Cal.2d 678, 690-691 [76 Cal.Rptr. 225, 452 P.2d 329].)

### A.

At trial, Whyte called seven witnesses, but only two, petitioner and Max Romero, directly supported the alibi.[6] Although the police supplied Whyte with the names and addresses of all the males detained at the party, and petitioner and his family provided him with the names of several of the females, Whyte apparently interviewed none but Romero and his girl friend, Penny Rochelle. Had he investigated further, he could have located at least six other witnesses who later testified or signed affidavits corroborating petitioner's assertion that he was at the party all evening except when he and Romero left in the Volkswagen to purchase some beer. Three other witnesses have made statements to the effect that they encountered petitioner and Romero near the liquor store, asked them to go back and purchase more beer, then followed them from the store back to the party without incident.

Whyte asserts that he did not bother to speak to any of these witnesses because he already had what he considered a firm alibi presentation, and because he felt that calling a large number of teenage witnesses could have an adverse effect on the jury. His faith in the evidence he presented, however, was clearly misplaced; petitioner's credibility was obviously suspect *ab initio*, and Romero's testimony was predictably and thoroughly discredited when the prosecutor revealed that in his initial interview with the police, of which Whyte was aware, Romero disclaimed any acquaintance with petitioner.

Admittedly, an attorney may have legitimate reasons for deciding not to parade a large number of witnesses to the stand to corroborate an alibi: for example, if after reasonable investigation he finds they are untrustworthy, unsavory, or unconvincing, he may make the informed decision to keep them from the jury. But when, as in this case, "the knowledge necessary to an informed tactical or strategic decision is *absent* because of counsel's ineptitude or lack of industry, no such ground

---

[6]Petitioner's mother and father testified regarding petitioner's activity earlier on the day of the crime. One of the investigating officers was called to describe the method used to secure the premises where the party occurred, but her testimony was barred by a hearsay objection. The remaining witnesses, Oscar Sanchez and Alfred Reyes, exercised their Fifth Amendment privilege against self-incrimination and refused to testify.

of justification is possible." (*In re Saunders* (1970) 2 Cal.3d 1033, 1042, fn. 7 [88 Cal.Rptr. 633, 472 P.2d 921].)

Under closely analogous circumstances it was held in *People* v. *Rodriguez* (1977) 73 Cal.App.3d 1023, 1030-1031 [141 Cal.Rptr. 118], that limited evidence presented at trial in support of an alibi defense does not necessarily preclude a holding that the defense was in effect withdrawn by counsel's failure to investigate or present strong additional evidence. Because of the weakness of the evidence presented at trial, and the substantial additional evidence that Whyte apparently could have uncovered to support it, his incompetent preparation under the facts of this case "constitutes a withdrawal of a crucial defense just as effectively as if no testimony at all had been introduced to prove the alibi defense." (*Id.* at p. 1031.)

## B.

■ Whyte also failed to diligently pursue information implicating Oscar Sanchez as the killer. Counsel knew that Max Romero reported to the police that he saw Sanchez at the party waving a handgun in the air; but he decided the evidence should not be introduced because it would suggest that the party was something more than an innocent teenage gathering. Again the tactic is difficult to justify. The prosecution had already informed the jury that the assailant's car was found outside the party, that the coat he wore was recovered inside, and that many of the participants had attempted to flee when the police arrived. The jury could not have avoided the implication that the gunman was present at the party; counsel gained nothing, and may have lost all, by keeping from them the fact that Sanchez rather than petitioner was the person wielding a gun.

Again, counsel's failure to produce evidence supporting the defense was based largely on his failure to investigate. Whyte had the names and addresses of several witnesses who could have assisted in implicating Sanchez: at the habeas corpus hearing, one testified that she saw Sanchez at the party, wearing a green coat and waving a small black gun in the air; two others testified that Reyes returned to the scene of the party after the police left and stated that Sanchez had shot someone; several others said they saw Sanchez leave or return to the party with Reyes. Furthermore, had Whyte spoken to Linda Couture, the

eyewitness in the pizza shop, and asked her to describe the person with Reyes, he could have secured crucial factual support for the theory that Sanchez was the killer and petitioner was not.

In addition, petitioner's family reported to Whyte two significant incidents implicating Sanchez, both of which Whyte failed to investigate or attempt to utilize. The first was a phone call made by Sanchez to his former girl friend. The girl subsequently came to petitioner's mother and told her that Sanchez had claimed he shot a postman in Duarte at close range with a handgun, and that he was in Texas to avoid capture. Petitioner's mother promptly relayed this information to Whyte.

Whyte asserts that he decided not to pursue this witness because he did not want Sanchez to discover through her that he was a suspect, as he might decide to remain out of the state. But this rationale cannot justify Whyte's failure to contact the witness *after* Sanchez returned to Duarte and was taken into custody pending the preliminary hearing. Given the highly exculpatory nature of the information this witness relayed, and her willingness to give an unsolicited report of what she knew to petitioner's family, competent counsel would have attempted to ascertain whether she would testify in his client's behalf. Instead, Whyte made the untested assumption that she would not cooperate, claiming at the hearing that she "was a teenage Chicano ... and it's been my experience they can go either way."

Whyte was also apparently informed by petitioner's mother of the threats Sanchez made to petitioner and his family. She testified that Whyte's only response was to advise her not to contact the police. Whyte did not further inquire about the incident; and although at trial he called two of the five eyewitnesses, he did not ask them to describe what happened or to recall Sanchez's statements. Whyte offers no tactical reason for his inaction, but instead denies having received the information. Although the referee made no specific finding regarding the conflicting stories of Whyte and petitioner's mother, he did criticize Whyte's failure to interview a witness whose only relevance to this case was his presence when Sanchez made the threats. We therefore presume that the referee found it unlikely, as we do, that petitioner's mother would not inform Whyte of the incident after Whyte urged her to report any information she discovered relevant to the case.

## C.

■ Finally, petitioner alleged and the referee found that Whyte was incompetent in failing to investigate or challenge the identification procedures employed by the police. Once more, the "tactical decision" by counsel appears dubious at best; and again, because it followed from "ineptitude or lack of industry" on his part (*In re Saunders, supra*, 2 Cal.3d at p. 1042, fn. 7), it cannot shield him from the charge of incompetence.

In evaluating counsel's conduct related to this issue, we assess both what he knew and what he could have learned through diligent investigation of facts and law that should have prompted him to move to exclude the identification testimony.

Several known aspects of the identification process tended to be highly suggestive of guilt. First, petitioner was barechested and handcuffed, while almost all the other suspects were not. (See *United States* v. *Wade* (1967) 388 U.S. 218, 234 [18 L.Ed.2d 1149, 1161, 87 S.Ct. 1926].) Second, before viewing the shirtless petitioner, the Laras were shown a green coat recovered inside the house from which petitioner and the others had fled; the brothers recognized it as the gunman's and could easily have inferred that petitioner had shed it to avoid identification. (Cf. *id.* at p. 233 [18 L.Ed.2d at pp. 1160-1161].) Third, petitioner was singled out by being brought to the Laras from a different direction than the others. Fourth, although all the other suspects were presented in lineups of four to six persons several yards in front of the vehicle containing the witnesses, petitioner alone was conducted to within a few feet of the rear side window, where, some evidence suggests, a flashlight was shone in his face. Fifth, apparently no effort was made to separate the witnesses. (See *People* v. *Nation* (1980) 26 Cal.3d 169, 180 [161 Cal.Rptr. 299, 604 P.2d 1051].) Sixth, petitioner was the last suspect shown, although he had been available for inclusion in earlier lineups. Finally, the Laras stated before trial that whereas the police did not specifically inquire about any other suspects, when petitioner was shown to them, they were asked if he was the killer. (Cf. *Wade, supra*, at p. 233 [18 L.Ed.2d at pp. 1160-1161].)

Evidence regarding the condition of the Laras both at the time of the shooting and during the lineup process tends to demonstrate that their "susceptibility to suggestion" was high (*Wade, supra*, at p. 229; see also *People* v. *Caruso* (1968) 68 Cal.2d 183, 188) and casts further doubt

on the reliability of their identification of petitioner. First, they initially described their assailants as half a foot taller and several years older than petitioner, and thereby raised some suspicion that their identification was based not on petitioner's resemblance to the assailant but on the suggestive conditions of the identification. (See *People v. Martin* (1970) 2 Cal.3d 822, 833 [87 Cal.Rptr. 709, 471 P.2d 29].) Second, they admitted that they had been drinking earlier in the evening. Although they claimed they were sober when the shooting occurred, they made the arguably irrational assumption at that time that the gunman was firing blanks and attempted to attack him. Third, they were both injured and remained somewhat dazed when viewing the suspects. Fourth, a police report reveals that they identified two additional suspects, asserting that they were "positive that one of the subjects, possibly both, assisted [petitioner] in the shooting." The latter suspects were arrested but released within hours, presumably because the police determined that the identifications were in error. Such evidence could well raise a suspicion that the Laras were being less than meticulous in pointing out suspects.

Diligent inquiry of the many eyewitnesses to the identification would have uncovered additional evidence of suggestive circumstances. All the persons attending the party were detained outside, where the lineups were conducted. Several testified at the hearing that they witnessed overt police activity suggesting petitioner's guilt. For instance, one of the youths testified at the hearing that he heard the police state to the Laras as petitioner was brought to the car, "He's the last person, you'd better make up your mind." The witness also claimed, consistently with petitioner's testimony, that one or more of the officers referred to petitioner as the "murderer." Another witness testified that she heard someone shout, "We got him, we got him," as petitioner was brought to the lineup area. Others corroborated petitioner's testimony that he was the only suspect brought to the side of the vehicle in which the Laras sat. Finally, had defense counsel spoken to Ms. Couture, he could have discovered that she observed the three brothers staggering in a drunken fashion while they were arguing among themselves before the shooting incident. This evidence, too, could have cast serious doubt on the reliability of their subsequent observations.

Nevertheless, Whyte made no effort either before or during trial to exclude the identification testimony. He explained, "I felt that the District Attorney would have cleaned that up so quickly, so easily. After all, a 1538.5, [*sic*] he would have his five or six officers there. They

would go over it. I had already been exposed to them at the preliminary. Several of them. They were well-seasoned. There wasn't anything wrong with it, and I felt that they would practically close the door with any small argument I would have with the jury ....[7]

"Q. So you felt that you would forego this motion on due process grounds because you were worried that the police witnesses or even the District Attorney, seeing some problem with the identification, might, quote, clean it up?

"A. No question. 1538.5 in the year 1978 was beginning to lose a lot of its usefulness."

Whyte's explanations serve only to demonstrate once again his utter failure to fulfill his obligations to his client. As the referee observed, his assertion regarding the declining usefulness of Penal Code section 1538.5 "is not very complimentary to his knowledge of case law under that code section." Nor does it present a flattering picture of Whyte's understanding of the appropriate procedure for challenging a suggestive identification. (See *People* v. *Martin, supra*, 2 Cal.3d 822, 832, fn. 11.) More important, no competent defense attorney with a minimal awareness of relevant precedents would have concluded so casually that "there wasn't anything wrong" with the identification procedures.[8]

Federal and California courts have on occasion upheld suggestive showup procedures staged shortly after arrest, recognizing that the exigencies of the situation may justify the absence of some procedural protections mandated at later stages of the investigation. (*People* v. *Odom* (1980) 108 Cal.App.3d 100, 110 [166 Cal.Rptr. 283], and cases cited.) But the courts have never departed from the proposition that an "unnecessarily suggestive" procedure, regardless of when or where it is conducted, violates the suspect's right to due process. (*Stovall* v. *Denno* (1967) 388 U.S. 293, 299-302 [18 L.Ed.2d 1199, 1204-1206, 87 S.Ct. 1967]; *In re Smith* (1970) 3 Cal.3d 192, 198-199 [90 Cal.Rptr. 1, 474 P.2d 969]; *In re Hill* (1969) 71 Cal.2d 997, 1003 [80 Cal.Rptr. 537,

[7]In fact, only one officer testified at the preliminary hearing, and he admitted that petitioner was handcuffed, wore no shirt, and was separated from the other suspects.

[8]Although Whyte asserted at the hearing that he exhaustively researched every legal issue relevant to petitioner's case, he could not explain the absence from his case file of any legal memoranda or other evidence of research, except to postulate they had been misplaced or stolen.

458 P.2d 449]; *People v. Caruso, supra*, 68 Cal.2d 183, 188.) Moreover, if the methods employed are suggestive, it is incumbent on the prosecution to prove that they are justified by the circumstances. (*In re Hill, supra*, 71 Cal.2d at pp. 1005-1006.)

We noted in *People v. Nation, supra*, 26 Cal.3d 169, 179, that "a penetrating concern as to the propriety of a pretrial identification should be a commonplace consideration to any attorney engaged in criminal trials. 'In any case in which the defendant has been identified at a pretrial confrontation conducted without counsel, defense counsel . . . should consider an attack upon the identification procedure . . . on the ground that the confrontation was unfair.'" In the case at bar, the evidence available to the defense could, if believed, establish that the procedure used was extraordinarily suggestive. Thus, even if the immediacy of the investigation justified some degree of suggestiveness, a competent defense attorney would have challenged the questionable official statements and conduct alleged by the potential defense witnesses herein.

We find unacceptable Whyte's explanation of his failure to act as a means of preserving the issue for the jury. On the callous assumption that the arresting officers would perjure themselves, he did not take the trouble to investigate the many known witnesses who could have corroborated petitioner's allegations of unfairness. As petitioner points out, even if the officers had testified falsely and defeated the attempt to exclude the identification in advance, Whyte would not have been precluded from arguing the issue to the jury at trial. Moreover, if a "clean up" had in fact occurred, the officers' false testimony could have been impeached directly by information in the police reports and indirectly by the preliminary hearing testimony of the Lara brothers. Furthermore, one does not insulate evidence of suggestiveness from any feared prosecutorial conspiracy by awaiting trial to raise the issue: the oath is no more powerful at trial than before to coax the truth from those who would fabricate. Finally, counsel's decision to wait did not prevent him from making a motion at trial to exclude the identification testimony, and could not justify his failure to do so. (*People v. Martin, supra*, 2 Cal.3d 822, 832, fn. 11.)

This case does not involve any defense that would be enhanced by preserving rather than excluding evidence of the identification and the suggestiveness of the police conduct. Furthermore, because the Laras' perceptions at the time of the shooting appear to have been impaired, it

is unlikely that their later identifications of petitioner could be cured of the taint. (See *People* v. *Caruso, supra,* 68 Cal.2d 183, 189-190.) For these reasons, and "Since an objection to the identification evidence would have been adjudicated outside the presence of the jury, there could be no satisfactory tactical reason for not making a potentially meritorious objection." (*People* v. *Nation, supra,* 26 Cal.3d at p. 179.)

We need not decide, of course, whether the allegations of suggestiveness are true or whether, if true, they constitute a denial of due process. It is sufficient for the present purpose to observe that the defense was *potentially* meritorious, and that petitioner was denied an adjudication on the matter because of his counsel's inadequate factual and legal preparation. (See *People* v. *Farley* (1979) 90 Cal.App.3d 851, 865 [153 Cal.Rptr. 695].)

We recognize that this case raised special problems that could warrant or demand novel investigative techniques. Teenage members of the Duarte community were generally reluctant to come forward, either because of an implicit taboo against incriminating their peers or, more likely in this case, because of rumors of overt and apparently serious threats of retaliation by the true culprit. It is conceivable that diligent investigation prior to trial would have provided counsel with little additional support. But these difficulties could not justify counsel's a priori conclusion that none of the dozens of known potential witnesses could be obtained. "The fact that a witness if called *might* refuse to testify is no excuse." (Italics added.) (*People* v. *Williams, supra,* 57 Cal.2d 263, 272.)

Representation of an accused murderer is a mammoth responsibility. When Whyte received information suggesting that his client was falsely accused of this most serious of crimes and that the guilty party was intimidating witnesses, he should have recognized his heightened obligation to investigate the case, to pursue reluctant witnesses, and to redouble efforts to overcome the unusual obstacles placed in the path of developing the apparent truth. Instead, he incompetently delegated his duty to others, and in effect deprived his client of a constitutionally guaranteed opportunity to prove his innocence. Through the dedicated efforts of family, friends, new counsel, and many others in a common crusade for justice, petitioner has, after three years in prison, fully and convincingly demonstrated his right to receive that opportunity anew.

## IV.

The petition for writ of habeas corpus is granted. The judgment of conviction is vacated and petitioner is remanded to the Superior Court of Los Angeles County. Our order releasing petitioner on his own recognizance shall remain in effect unless the superior court determines that changed circumstances require a different disposition. (Cf. Pen. Code, § 1388.) Upon finality, the clerk shall remit a certified copy of this opinion and order to the superior court for filing, and respondent shall serve another copy thereof on the prosecuting attorney in conformity with Penal Code section 1382, subdivision 2.[9]

Tobriner, J., Richardson, J., Newman, J., Broussard, J., and Tamura, J.,* concurred.

**BIRD, C. J.,** Concurring.—This young man spent almost three of his most formative years in prison because basic rules of procedure were not followed. If the police had taken the time and care to conduct a fair lineup, a faulty identification would not have occurred. If the prosecutor had followed proper practice, he would not have entered into a plea bargain that sealed the lips of a person who knew the truth. If the trial court had taken the time to review this matter properly, these errors would have been disclosed and corrected at a much earlier time. I agree with the majority that the writ of habeas corpus should be granted.

This case brings home to us the human costs that result when those in authority within the judicial system fail to follow the rule of law.

For example, consider the questionable practices of the district attorney's office here.

Several days after petitioner Hall was sentenced to life imprisonment for the murder of Jesse Ortiz, the district attorney entered into a plea

---

[9]Section 1382, subdivision 2, was amended in 1973 to provide that "after the issuance of a writ or order which in effect grants a new trial," the defendant must be brought to trial "within 60 days after notice of the writ or order is filed in the trial court and served upon the prosecuting attorney ...." By analogy to its normal procedure after a decision on appeal (Code Civ. Proc., § 912), the superior court is competent to file the order herein upon receiving it from our clerk. But there is no practical or convenient way for our clerk to "serve" that order on the prosecuting attorney. To insure compliance with the latter requirement, we therefore direct respondent Attorney General to effectuate such service.

*Assigned by the Chairperson of the Judicial Council.

bargain with Alfred Reyes. Reyes had made a statement to the police shortly after the Ortiz homicide implicating Sanchez, rather than petitioner, as the murderer of Jesse Ortiz. At the time of this plea bargain, Reyes had pending against him the charges that he had participated in the murder of Jesse Ortiz and in an unrelated murder.

In this plea bargain, consummated in March 1979, the prosecutor agreed to dismiss the counts which charged Reyes with the murder of Ortiz. In exchange, Reyes entered a plea of guilty to the other murder. A further term of the plea bargain was that Reyes was not to "make any statement, under oath or by declaration under penalty of perjury" concerning the Ortiz murder, without first notifying the prosecutor of his intent to do so. He had to agree to submit to a complete interview with the sheriff's department and to take a lie detector test. The prosecutor further reserved the right to refile the counts charging Reyes with Ortiz's murder if Reyes violated the plea agreement and made any statements about Ortiz's murder.

While not completely sealing Reyes' lips about the Ortiz murder, this plea bargain agreement made it much to Reyes' advantage to refuse to cooperate with petitioner's attorneys when they sought evidence which would overturn petitioner's conviction. As long as Reyes refused to make any statement under oath or penalty of perjury, he had the assurance of the district attorney's office that the Ortiz murder charge would not be refiled. If Reyes nonetheless wished to make a statement under oath, he first had to notify the prosecutor and submit to a complete interview by the police, including a lie detector test. Not surprisingly, Alfred Reyes refused to make any statement until January 1981 after the prosecutor finally agreed to waive this condition of the plea bargain.

This aspect of the plea bargain was a form of witness intimidation that should not have been engaged in by prosecutorial authorities. This is especially true when the prosecutor knew that Reyes had information which pointed to petitioner's innocence and Oscar Sanchez's guilt. As this court stated in *In re Ferguson* (1971) 5 Cal.3d 525, 531 [96 Cal.Rptr. 594, 487 P.2d 1234]: "In light of the great resources at the command of the district attorney and our commitment that justice be done to the individual, restraints are placed on him to assure that the power committed to his care is used to further the administration of justice in our courts . . . ."

The administration of justice was in no way furthered by the unusual plea bargain the prosecutor made with Alfred Reyes. The prosecution knew that Reyes had earlier told police that he had picked up Oscar Sanchez near the scene of the homicide and that Sanchez had admitted to him that he had "just shot some dudes." The placement of onerous conditions on Reyes' ability to give evidence which was exculpatory to petitioner Hall, conditions which were enforceable by the refiling of murder charges against Reyes, was clearly designed to hinder inquiry into a conviction that the district attorney's office knew was questionable at best.

A prosecutor's responsibilities in the pretrial context are clear. (See, e.g., *In re Ferguson, supra,* 5 Cal.3d 525; *People* v. *Ruthford* (1975) 14 Cal.3d 399 [121 Cal.Rptr. 261, 534 P.2d 1341].) This same duty not to suppress or otherwise make unavailable evidence favorable to the defendant (*id.,* at p. 406) must also apply to postconviction proceedings. To rule otherwise would be to limit the availability of remedies created to vacate erroneous convictions.

Rather than merely allude to "doubts as to the propriety" of the plea bargain with Reyes (maj. opn., *ante,* at p. 422), I would specifically disapprove this plea bargain and any plea bargain which would utilize the prosecution's considerable bargaining power to inhibit the flow of exculpatory information to a defendant, either pretrial or during the pursuit of postconviction remedies.

At a time when exclusionary rules and procedural protections in the criminal law are loudly assailed as barriers to the accomplishment of justice, it is appropriate to note that had petitioner's trial attorney pursued the appropriate procedures for the suppression of the tainted identification testimony, the miscarriage of justice suffered by petitioner might well have been prevented. Finally, the authorities could have turned their full energies toward solving the murder of Jesse Ortiz rather than defending the fatally flawed procedures employed to convict petitioner of a crime he did not commit.