[No. S027758. June 29, 1998.]

In re WILLIE DARNELL JOHNSON on Habeas Corpus.

**450**

**COUNSEL**

John T. Philipsborn, Richard C. Neuhoff, Aundre M. Herron, Jean R. Sternberg and Lynne S. Coffin, under appointments by the Supreme Court, for Petitioner.

Daniel E. Lungren, Attorney General, George Willliamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald S. Matthias, Ann K. Jensen, Dane R. Gillette, Joan Killeen, Morris Beatus and Donna B. Chew, Deputy Attorneys General, for Respondent.

**OPINION**

**WERDEGAR, J.**—A Contra Costa County jury convicted petitioner Willie Darnell Johnson of the murder of Mrs. Willie Womble (Pen. Code, § 187; all further statutory references are to this code unless otherwise specified), the attempted murder of Angela Womble (§§ 187, 664), robbery in an inhabited dwelling (former § 213.5, see now § 212.5), and first degree burglary (§§ 459, 460). The jury found true robbery- and burglary-felony-murder special-circumstance allegations. (§ 190.2, former subd. (a)(17)(i) & (vii),

see now subd. (a)(17)(A) & (G).) The jury also found petitioner personally used a firearm in the commission of these offenses (§ 12022.5) and inflicted great bodily injury in the commission of the attempted murder, the robbery and the burglary (§ 12022.7). The same jury sentenced petitioner to death. This court affirmed the judgment in its entirety. (*People* v. *Johnson* (1992) 3 Cal.4th 1183 [14 Cal.Rptr.2d 702, 842 P.2d 1].)

In a petition for writ of habeas corpus, petitioner alleged numerous claims attacking the judgment as to guilt and penalty. This court issued an order to show cause limited to the question why petitioner should not be granted relief on the ground he is factually innocent of the murder of Willie Womble, in that his deceased brother, Timothy Johnson, committed the crime.

After the filing of respondent's return and petitioner's traverse, we determined that disputed facts necessitated an evidentiary hearing. (See *People* v. *Romero* (1994) 8 Cal.4th 728, 737-740 [35 Cal.Rptr.2d 270, 883 P.2d 388].) The Honorable Richard Patsey, Judge of the Contra Costa County Superior Court, was appointed referee with directions to take evidence and make findings of fact on the following question: "Is petitioner innocent of the murder of Willie Womble, in that his deceased brother, Timothy Johnson, committed the crime?" After hearing the evidence, the referee found petitioner had not met his burden of establishing his innocence and made additional findings related to the credibility of the witnesses who testified before him.

We conclude the referee's findings are supported by substantial evidence and therefore deny the petition for writ of habeas corpus. We further deny petitioner's motion to reopen the evidentiary hearing to permit the taking of additional evidence.

### FACTUAL AND PROCEDURAL BACKGROUND

The events leading to petitioner's conviction and sentence are set forth in *People* v. *Johnson, supra,* 3 Cal.4th 1183, and summarized here. The evidence at trial showed that on July 1, 1986, Angela Womble lived with her mother, Mrs. Willie Womble, and her 16-month-old son, Terrance (Tee Tee), on South 42nd Street in Richmond. Tee Tee's father was Angela's former boyfriend, Terrance (Tee) Henderson, a reputed drug dealer. While still Henderson's girlfriend, Angela had held sums of money for him. After their relationship ended in August 1984, however, she ceased to do so.

Having cashed a payroll check on July 1, 1986, that evening Angela put cash in envelopes to pay bills. Around 9:45 or 10 p.m., Angela heard a

knock at the front door. She asked who was there and heard a man answer, "Ann, this is Allie. Come take me to the gas station." She recognized the voice as that of John Allen Duchine, a friend of Terrance Henderson, and opened the door. On her front porch were Duchine and another man whom she did not know; both were carrying guns. The two forced their way into the house, knocking Angela to the floor.

Angela sat on the floor, looking at the men, for one or two minutes. At trial she testified lights were on in the breakfast nook and the bathroom; she could not remember whether the kitchen and living room were illuminated; the porch light was off. There was a street light to the north of the Womble residence. Angela testified Duchine's companion, whom she later identified as petitioner, was wearing a white T-shirt and jacket and a shiny stud earring and was carrying a shotgun about 20 inches in length with a barrel about the size of a 50-cent piece.

Mrs. Womble ran to the living room and began to hit petitioner, trying to force him to let go of his gun and demanding he leave her house. Petitioner pushed Mrs. Womble to the ground with his gun. Angela told her mother to stop and sit down.

Duchine demanded Angela give him money. She got up and retrieved the money from the bill payment envelopes, giving it to Duchine; she then returned to the living room and sat down. Duchine ordered her to give him all the money. Angela said she had given him all she had, but he demanded, "Where's Tee's money?" Angela said she did not have Tee's money. Duchine accused her of lying and again asked where the money was.

Angela, carrying Tee Tee, and Duchine went to Mrs. Womble's bedroom. Duchine rummaged through the room, looking for money. Eventually Angela returned to the living room. Twenty seconds to a minute later, Duchine also returned. Angela later discovered several items in her bedroom had been moved. Duchine and petitioner spoke with each other, but Angela could not hear what they said.

Petitioner pumped the shotgun and fired it into the ceiling. Angela urged her mother to lie down. Petitioner again fired into the ceiling, then pointed the weapon down and fired into the back of Mrs. Womble's head. Petitioner and Duchine then pointed their weapons at Angela, who also had lain down on the floor. She tried to duck, but felt she had been shot. Ten or fifteen seconds later, Duchine and petitioner left the house, closing the front door behind them.

Angela crawled to the front door, but could not open it. Tee Tee pulled the door open for her and she screamed for help. Several neighbors responded.

Angela told one of her neighbors she had been shot by Duchine and another man. A police officer arrived and asked Angela who had shot her. She named Duchine and described him; she said she did not know the other man, but gave a brief description of him.

Various neighbors of the Wombles' testified as to their observations on the night of the crimes. Police officers who responded to the call testified they were able to see in the lighting conditions present in the Womble residence. Other testimony showed petitioner and Duchine were together on the day of the crimes and after the crimes participated together in a telephone call.

The day after the offense, a detective interviewed Angela at the hospital where she was receiving treatment. She had difficulty breathing and was connected to an oxygen machine. The detective showed her two photographic lineups, each consisting of six photographs. In the first lineup, Angela positively identified Duchine's photograph. In the second, Angela identified petitioner's photograph, saying she was not positive but he looked like the man who shot her mother. She gave a verbal description of the gunman and said that friends and relatives had told her Duchine's accomplice was "Willie Johnson." In a later telephone interview, Angela again described the man in a fashion generally consistent with her earlier descriptions.

On July 17, having learned petitioner was in custody in Martinez, the detective attempted to arrange for Angela to view a live lineup. Petitioner refused to participate despite advice that he did not have a right to refuse and that the refusal could be used against him in court.

No physical evidence linked petitioner to the crime. The defense was misidentification. Dr. Elizabeth Loftus, a professor of psychology, testified about factors affecting human perception, memory and identification.

## Habeas Corpus Proceedings

As noted, this court affirmed petitioner's conviction and sentence on appeal in 1992. During the pendency of the appeal, petitioner filed a petition seeking a writ of habeas corpus on the ground, inter alia, of his actual innocence of the capital offense. In support, petitioner submitted the declarations of various individuals to the effect that Timothy Johnson, petitioner's brother (who had died in 1989), acknowledged to them his guilt, and implied petitioner's innocence, of the offenses for which petitioner had been sentenced to death. Petitioner also filed the declaration of John Allen Duchine,

petitioner's accomplice, who had been convicted at his separate trial of murder and other charges arising out of the Womble shootings. Duchine declared petitioner had not been present during the offenses and that Timothy Johnson was the person who fired the shots.

*Evidence presented at the hearing*

The thrust of petitioner's case at the evidentiary hearing was to establish Timothy Johnson's guilt by showing that, at the time of these offenses, Timothy was engaged in a turf war with the Henderson family over the crack cocaine trade in the Easter Hill neighborhood of Richmond, in furtherance of which Timothy planned and executed the Womble robbery murder. Petitioner also presented the testimony of various witnesses to the effect that he and Timothy were similar in appearance.[1]

Petitioner presented evidence showing that during the summer of 1986 Timothy Johnson was engaged in selling and using crack cocaine. Timothy had committed at least two robberies and burglaries against other drug dealers and had a reputation in the community for violence and a quick temper. Timothy was a good friend of, and often spent time with, John Allen Duchine, who previously had lived next door to Timothy. Some two weeks before the Womble shootings, Duchine "watched" Timothy's "back" during a shoot-out with Kenneth Moore, an ally of the Henderson brothers. At that time the Henderson brothers, more than anyone else, controlled the sale of crack cocaine in Easter Hill. The Moore shoot-out was an offensive move aimed at wresting control of the cocaine trade from the Hendersons. The same weapon Timothy used in the Moore shooting later was used to kill Mrs. Willie Womble.

When petitioner was released from prison in late June 1986 after serving a sentence for his prior manslaughter conviction, he was unaware of the

---

[1] The referee made no finding on petitioner's and Timothy Johnson's similarity or dissimilarity of appearance, concluding such a finding was unnecessary for resolution of the question before him. Noting petitioner claimed he and his brother looked alike at the time of the offense, but the evidence presented at the hearing undermined that contention, respondent asks that we make the following finding: "Petitioner and Timothy Johnson had different appearances and facial features. The photographs of petitioner and Timothy Johnson show that petitioner had a rounder face and was generally clean-shaven, while Timothy Johnson always had facial hair. At the time of the Womble shootings on July 1, 1986, Timothy Johnson did not have short hair. At the time of the Womble shootings, petitioner had short hair and wore a post earring in his left ear." We agree with the referee that resolution of the question whether petitioner has sustained his burden of proving that Timothy Johnson perpetrated the offense does not require any finding on the degree of similarity of the brothers' appearances. Respondent, moreover, cites no authority requiring this court to make factual findings unnecessary to the ultimate issue after a referee appointed by us declines to do so following an evidentiary hearing conducted pursuant to our order.

tension between Timothy and the Hendersons. Until his release, petitioner had minimal, if any, personal acquaintance with Duchine.

Loreen Jackson Johnson, Timothy's widow, testified she heard Timothy and Duchine discussing a plan to rob the Wombles of money they believed Angela Womble was holding for Terrance Henderson. At the hearing, Duchine did not deny participating in such a discussion. Other witnesses variously testified Timothy told them he was planning to rob the Hendersons, the Wombles, or a house on 42nd Street (the address of the Womble residence). Michael Wayne Davis, King Arthur Wilson and Harvey Lacey testified Timothy unsuccessfully solicited their participation in the planned robbery.

Several witnesses testified to admissions or confessions Timothy made to them following the Womble shootings. Barbara Nichols, Timothy's good friend and godmother, testified Timothy told her he had shot a lady and indicated the crime was related to the Hendersons. Nichols also related that, on the night of the offense, Timothy brought Duchine to her house; Duchine appeared terrified and said something about being present at an event that led to a lady bleeding. Nichols further testified that, the day after the offense, Timothy hid his car in her garage; she saw a shotgun in the trunk of the car. King Arthur Wilson testified Timothy acknowledged to him, "I'm the one that shot them broads," and Clarence Webster testified Timothy said his brother Will was doing time for killings he (Timothy) had committed. Timothy told his former girlfriend, Wanda Smith, that he had planned the Womble robbery with Duchine, and no one was supposed to have been hurt. Michael Wayne Davis testified Timothy stated, "I fucked up."

Mary Duchine, John Allen Duchine's mother, testified her son disclosed to her Timothy's involvement in the Womble shootings; John Allen also acknowledged telling his mother of Timothy's involvement. The number and timing of his disclosures were disputed and somewhat unclear from the testimony. In particular, Mary Duchine appeared to say both that her son implicated Timothy while in pretrial custody and that he may have done so only after his conviction. John Allen Duchine testified that he recalled implicating Timothy in a conversation with his mother after Timothy's death, but did not remember doing so while awaiting trial.

At the hearing before the referee, Duchine recanted his declaration and confirmed it was petitioner, not Timothy, who had perpetrated the Womble offenses. Duchine explained he had executed his declaration because he and his family felt pressure to spare petitioner from the death penalty, but he was now unwilling to do anything that might interfere with his efforts to secure relief from his own conviction.

*Referee's findings*

The referee made the following findings and observations on Duchine's credibility: "Mary Duchine, John Duchine's mother, testified that John Duchine told her before his trial that Tim Johnson, rather than petitioner, was the shooter. On the other hand, Mary Duchine's hearing testimony indicates she was confused about when this conversation took place. From her statements to petitioner's investigator in 1989, it may well be that Duchine spoke to her on this issue after his trial, as he asserts.

"Two of petitioner's investigators testified that Duchine had confirmed to them the accuracy of his 1992 declaration. Duchine disputed their testimony, and the paucity of notes taken by the investigators raises questions about the weight to be given their testimony.

"Petitioner points out that Duchine expressed concern at the hearing about doing anything that might interfere with his posttrial relief applications. This concern, urges petitioner, shows Duchine's hearing testimony to be false. I disagree. I find the concern mentioned by Duchine more likely to be his fear that false testimony at the hearing could hurt his chances in other proceedings.

"While Duchine's testimony at the hearing is not free from doubt, I find Duchine's testimony at the hearing to be more credible than his declaration. He seemed to me intent on explaining his past inconsistencies about who was present during the shootings. I did not discern any animosity of Duchine toward petitioner. To the contrary, he seemed to be friendly toward him."

The referee made the following additional findings:

"1.  Petitioner, not Timothy Johnson, was present during the Womble robbery and shot and killed Willie Womble with a shotgun on July 1, 1986.

"A.  John Duchine's testimony at the evidentiary hearing, recanting his declaration of April 2, 1992, and identifying petitioner as the culpable party, was more credible than his declaration. In making this finding, I have considered both Duchine's demeanor and the substance of his testimony at · the evidentiary hearing. Further, at his own trial, Duchine admitted his presence during the Womble robbery and implicated petitioner in the Womble shootings, consistent with his hearing testimony. His declaration fails to establish a credible motivation for Duchine to have implicated petitioner falsely at his own trial.

"Duchine also explained the reason he signed the 1992 declaration. He received threats, especially after Timothy Johnson died, to say . . . Timothy

Johnson was the gunman and felt 'pressure' from others to save petitioner from the death penalty. His recantation of his signature on the 1992 declaration is credible.

"B. I find the 1992 declaration to be suspect. Unlike Duchine's trial testimony, which was subject to vigorous testing on cross-examination, the declaration is barren of any detail regarding the Womble shootings. The manner in which the declaration was secured, particularly the failure by petitioner's agents to take notes of critical matters during meetings with Duchine, raises questions as to its unreliability.

"I find unpersuasive the testimony which petitioner produced to support the reliability of the declaration. In particular, I find the testimony of Duchine's mother too uncertain and inconsistent to support petitioner's claim that the declaration was reliable.

"C. The testimony about Timothy Johnson's 'admissions' regarding the Womble shooting is suspicious and therefore lacks credibility. First, the declarant is dead. Second, the witnesses who reported the confession have all previously been convicted of crimes involving moral turpitude. Third, the failure of the witnesses to come forward until years after the conviction and Timothy Johnson's death is not credibly explained. In addition, with reference to the specific testimony of King Arthur Wilson and Barbara Nichols, I find their testimony not credible because such testimony is implausible in material details, as well as inconsistent internally and in relation to the witnesses' prior statements.

"D. Petitioner has presented evidence that Timothy Johnson planned the Womble robbery. I find that the evidence of who planned the robbery and the reasons for its commission are not dispositive of the identity of the actual perpetrators. More credible, in my view, is the testimony of John Duchine at the evidentiary hearing that petitioner, not Timothy Johnson, participated in the crime, a fact not inconsistent with the possibility of Timothy Johnson being the mastermind behind the robbery and later expressing regret that its commission entangled his brother in a capital crime."

PETITIONER'S CHALLENGES TO REFEREE'S EVIDENTIARY RULINGS

Petitioner contends certain rulings by the referee erroneously narrowed the scope of evidence received at the reference hearing, denying petitioner a full and fair hearing as guaranteed by the due process, equal protection and cruel and unusual punishment clauses of the federal Constitution. (U.S. Const., 8th & 14th Amends.) By separate motion, petitioner asks this court to reopen the

reference hearing to permit the taking of the additional evidence he asserts the referee improperly excluded.[2] We conclude the referee correctly denied admission of the evidence and therefore deny the motion.

Petitioner proposed to introduce evidence falling into several broad categories: alibi evidence; sociological evidence to establish why persons in the Richmond community who allegedly knew of his brother's guilt would not have come forward sooner; testimony to show why Angela Womble's identification of petitioner as her attacker was the product of improper suggestion; and expert testimony to show that the audiotape of Angela Womble's statement to the police had been tampered with, thereby undermining petitioner's ability to prove the unreliability of her identification.[3] The referee sustained respondent's objections to the admission of these categories of evidence and petitioner now assigns the rulings as error. We shall consider in turn each of petitioner's exceptions to the various rulings.

■ Respondent objected to the admission of any alibi evidence on the basis the habeas corpus petition failed to allege alibi as a ground for relief. In sustaining the objection and ruling alibi evidence inadmissible unless respondent "opened the door" to it, the referee agreed, adding: "[T]he issue tendered by the Supreme Court is not whether petitioner is innocent because of an alibi, but whether petitioner is innocent because his deceased brother, Timothy, committed the crime. Accordingly, the court intends to limit petitioner to show the culpability of Timothy Johnson."

We need not determine whether the referee's understanding of the scope of the proceeding, as it pertained to evidence of alibi, was correct, inasmuch as the record fails to demonstrate either that petitioner had actual alibi evidence to present or what it might have been. Petitioner, who at no prior time since the inception of the case ever presented any alibi evidence, made no offer of proof. Instead, he merely stated, rather cryptically, "Petitioner intends to present evidence (if it is deemed pertinent under this Court's definition of the scope of the hearing) on his whereabouts during the pertinent events . . . ." In a footnote, he added: "Petitioner notes that in view of the Fifth Amendment issues presented by the presentation of such

---

[2]Petitioner also pleads the referee's assertedly erroneous evidentiary rulings and denial of petitioner's motion to recuse the Contra Costa County District Attorney's office from the conduct of the evidentiary hearing as "supplemental allegations" to his petition for writ of habeas corpus.

[3]Petitioner also suggests the referee erred in denying him the opportunity to present evidence concerning his alleged mental impairments, which, he contends, would have refuted any inference that his refusal to participate in a lineup reflected a consciousness of guilt. Petitioner presents no argument or authority in support of this suggestion, however, and we therefore consider it no further.

evidence, he will go forward on this point only if the Court deems that there is a specific reason, under the reference order, for him to do so." This statement fails to assert directly and unequivocally that petitioner possessed available alibi evidence and, indeed, is subject to the inference that any such evidence would consist solely of petitioner's own self-serving testimony. On this record, therefore, we cannot say the referee improperly denied petitioner the opportunity to present alibi evidence.

■ Nor did the referee abuse his discretion in excluding evidence pertaining to the authenticity of the audiotape of Angela Womble's statement to police and the reliability of her pretrial and in-court identifications. As respondent observes, these issues were raised in the petition; by limiting our order to show cause to the question of Timothy Johnson's culpability, we impliedly found petitioner had not established a prima facie case as to the former issues. (*In re Visciotti* (1996) 14 Cal.4th 325, 329 [58 Cal.Rptr.2d 801, 926 P.2d 987].) The proffered evidence in this category therefore was irrelevant to the proceeding before the referee.

■ As noted, the referee also ruled inadmissible petitioner's proffered sociological evidence, but to facilitate our review the referee permitted him to lodge as part of the record the declaration of Martin Sanchez-Jankowski, Ph.D., associate professor of sociology at the University of California-Berkeley. Dr. Sanchez-Jankowski's declaration described the history, culture and mores of the City of Richmond, where petitioner grew up. As relevant here, Dr. Sanchez-Jankowski described the antagonism between the Richmond police and the community, as well as the "code of silence" proscribing communication to authorities outside the community about what went on inside it. Dr. Sanchez-Jankowski noted that, in the present case, most of the people who have information about the Womble shootings were born and raised under this code of silence and have expressed their fear of violating the code, at least before Timothy Johnson's death. He further declared that some of those who are now willing to talk about the case have moved away from Richmond and thus may no longer feel themselves subject to its norms, including the code of silence.

We conclude the referee acted within his discretion in excluding the testimony of Dr. Sanchez-Jankowski. The referee could reasonably conclude that generalizations about community mores would not substantially assist him in determining the credibility of the witnesses' individual explanations of their personal reasons for not coming forward sooner with their knowledge of the case. This is particularly so as Dr. Sanchez-Jankowski's testimony arguably would not have provided a persuasive explanation of why the witnesses would not earlier have shared their knowledge with petitioner's representatives rather than law enforcement.

Petitioner finally contends the referee's evidentiary rulings were erroneous under the rule of *In re Hall* (1981) 30 Cal.3d 408, 420 [179 Cal.Rptr. 223, 637 P.2d 690] (*Hall*), where this court stated: "[A] habeas corpus petitioner must first present newly discovered evidence that raises doubt about his guilt; once this is done, he may introduce 'any evidence not presented to the trial court and which is not merely cumulative in relation to evidence which *was* presented at trial' [citation] insofar as it assists in establishing his innocence." For this proposition, *Hall* relied on *In re Branch* (1969) 70 Cal.2d 200, 214 [74 Cal.Rptr. 238, 449 P.2d 174] (*Branch*). As distinct from the present proceeding, however, both *Hall* and *Branch* involved the broad inquiry into whether trial counsel rendered ineffective assistance by failing diligently to investigate the case in advance of trial. *Hall*, in addition, presented a claim for relief on the basis of newly discovered evidence. (See *Hall, supra,* 30 Cal.3d at p. 415.) Relevant, therefore, was both evidence that would have qualified as "newly discovered" for purposes of a motion for new trial and evidence that, although not so qualifying, was known or could have been discovered by diligent pretrial investigation; the opinion declared the above-quoted proposition in the context of rejecting the contention petitioner could not properly rely for relief on evidence that could have been presented at trial. Both *Hall* and *Branch* thus concerned the propriety of basing habeas corpus relief on the foregoing general categories of evidence. Neither case addressed the interplay between a referee's evidentiary rulings and the scope of a reference order of this court, much less held, as petitioner seems implicitly to argue, that a habeas corpus petitioner claiming actual innocence may introduce any and all exculpatory evidence regardless of the scope of a narrowly drawn reference order.

## PETITIONER'S EXCEPTIONS TO THE REFEREE'S FINDINGS

■ The proper allocation of the burden of proof in habeas corpus proceedings is well settled. "Because a petition for a writ of habeas corpus seeks to collaterally attack a presumptively final criminal judgment, the petitioner bears a heavy burden initially to *plead* sufficient grounds for relief, and then later to *prove* them. 'For purposes of collateral attack, all presumptions favor the truth, accuracy, and fairness of the conviction and sentence; *defendant* thus must undertake the burden of overturning them. Society's interest in the finality of criminal proceedings so demands, and due process is not thereby offended.' [Citation.]" (*People* v. *Duvall* (1995) 9 Cal.4th 464, 474 [37 Cal.Rptr.2d 259, 886 P.2d 1252]; see *People* v. *Ledesma* (1987) 43 Cal.3d 171, 243 [233 Cal.Rptr. 404, 729 P.2d 839] (conc. opn. of Grodin, J.) [habeas corpus petitioner must prove by preponderance of evidence his or her entitlement to relief]; *In re Imbler* (1963) 60 Cal.2d 554,

560 [35 Cal.Rptr. 293, 387 P.2d 6].) Our issuance of the order to show cause, limited to the question whether petitioner is innocent of the murder of Mrs. Willie Womble in that his brother committed the crime, indicated our preliminary assessment that petitioner would be entitled to relief if he proved his factual allegations that his brother committed the offense. (*People* v. *Duvall, supra,* 9 Cal.4th at p. 475.)

■ Equally well settled is the standard of review of the referee's findings. A referee's findings on factual questions are not binding on us, but are entitled to great weight when supported by substantial evidence. (*In re Malone* (1996) 12 Cal.4th 935, 946 [50 Cal.Rptr.2d 281, 911 P.2d 468].) Deference to the referee is called for on factual questions, especially those requiring resolution of testimonial conflicts and assessment of witnesses' credibility, as the referee has the opportunity to observe the witnesses' demeanor and manner of testifying. (*Ibid.*; see also *In re Avena* (1996) 12 Cal.4th 694, 710 [49 Cal.Rptr.2d 413, 909 P.2d 1017].) If, however, the referee's factual findings are not supported by ample, credible evidence, we may disregard them. (*In re Hitchings* (1993) 6 Cal.4th 97, 122 [24 Cal.Rptr.2d 74, 860 P.2d 466].) The referee's resolution of any legal issues or of mixed questions of law and fact is subject to our independent review. (*In re Cordero* (1988) 46 Cal.3d 161, 180-181 [249 Cal.Rptr. 342, 756 P.2d 1370].)

■ Petitioner contends the referee's finding on the ultimate question— whether petitioner is innocent, in that his brother committed the offenses—is a mixed question of law and fact subject to our independent review, citing *In re Marquez* (1992) 1 Cal.4th 584, 603 [3 Cal.Rptr.2d 727, 822 P.2d 435] (*Marquez*) and *In re Ross* (1995) 10 Cal.4th 184, 205 [40 Cal.Rptr.2d 544, 892 P.2d 1287] (*Ross*). We disagree. In *Marquez* we were concerned with the probable hypothetical effect on the trial of alibi evidence that trial counsel incompetently failed to present. Such a determination, we observed, is subject to independent review because it is contingent on a review of all the trial evidence in context, a review this court, rather than the referee, was in a position to undertake. (*Marquez, supra,* 1 Cal.4th at p. 604.) Similarly, in *Ross,* we independently reviewed the referee's (unsolicited) conclusion on the ultimate issue, i.e., the mixed law and fact question of whether trial counsel had rendered ineffective assistance. (*Ross, supra,* 10 Cal.4th at p. 205.) In this case, by contrast, we limited the referee's task to determining whether petitioner is innocent because Timothy Johnson committed the capital crime. The referee's finding on petitioner's claim of actual innocence was wholly dependent on his assessment of the credibility of the witnesses before him, a quintessentially factual inquiry to which the deferential standard of review applies.

Nor does *Hall, supra,* 30 Cal.3d 408, avail petitioner. In *Hall,* relying on *In re Weber* (1974) 11 Cal.3d 703 [114 Cal.Rptr. 429, 523 P.2d 229], we articulated a standard of review of claims of actual innocence: The evidence supporting such claims must be "conclusive" and " 'point unerringly to innocence.' " (*Hall, supra,* 30 Cal.3d at p. 423.) We rejected, however, the suggestion that this standard imposes "either the hypertechnical requirement that each bit of prosecutorial evidence be specifically refuted, or the virtually impossible burden of proving there is no conceivable basis on which the prosecution might have succeeded. It would be unconscionable to deny relief if a petitioner conclusively established his innocence without directly refuting every minute item of the prosecution's proof, or if a petitioner utterly destroyed the theory on which the People relied without rebutting all other possible scenarios which, *if* they had been presented at trial, might have tended to support a verdict of guilt." (*Ibid.*; see also *People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1246 [275 Cal.Rptr. 729, 800 P.2d 1159].) Applying this standard to the present case, in assessing whether petitioner has met his burden of proving his brother committed the murder we do not, for example, also require him to establish that Angela Womble's identification of him as the shooter was unreliable. Contrary, however, to petitioner's implicit argument, the cited authorities do not mandate independent review, much less rejection, of the referee's findings in this case.

Petitioner contends that because his trial was marred by numerous constitutional errors, "a more relaxed standard of proof must be applied" in assessing whether he has established his innocence. In support, petitioner cites *Strickland* v. *Washington* (1984) 466 U.S. 668, 694 [104 S.Ct. 2052, 2068, 80 L.Ed.2d 674] (*Strickland*), in which the high court, in the course of explaining the constitutional standard for review of ineffective assistance of counsel claims, noted, "The high standard for newly discovered evidence claims presupposes that all the essential elements of a presumptively accurate and fair proceeding were present in the proceeding whose result is challenged." Although petitioner does not clearly specify how, in his view, the appropriate standard of proof should be "relaxed," he may be understood to argue that any deficiencies in his case at the evidentiary hearing should be excused due to constitutional errors that occurred at his trial. We disagree. The cited proposition from *Strickland* has no application here, because in our decision on petitioner's direct appeal we found no errors of constitutional magnitude, and nothing in the instant proceeding alters that conclusion.

Our conclusion the referee's findings were of a factual nature and, therefore, are entitled to deference is not undermined by the referee's comment that John Allen Duchine's testimony at the hearing was consistent with his testimony at his own 1987 murder trial. Although Duchine's trial obviously

was not a proceeding in which the referee could directly assess Duchine's credibility, he did not purport to make such an assessment in finding Duchine testified credibly at the instant hearing.

Turning to the referee's individual findings, petitioner contends the referee erred in finding Mary Duchine to have been possibly mistaken or confused in her testimony regarding when her son indicated Timothy Johnson, not petitioner, was the gunman. Although the referee found it possible John Allen Duchine implicated Timothy to his mother *after* his own conviction and imprisonment, as Duchine testified, petitioner insists Duchine did so while in *pretrial* custody, as Mary Duchine testified.

Substantial evidence supports the referee's finding that Mary Duchine might have been mistaken about when her son disclosed Timothy Johnson was involved in the Womble murder. In her testimony she acknowledged he might have done so in 1989 or later and she was uncertain of relevant dates. In any event, the equivocal nature of the finding ("it *may well be* that Duchine spoke to her on this issue after his trial, as he asserts" [italics added]) militates against assigning it much weight. Petitioner suggests we disregard this finding, or, because it is assertedly "vague," accord it no deference. We conclude it is entitled to minimal weight.

Petitioner implies that Duchine, in discussing the case with family members prior to his trial, "exonerated" petitioner by telling them Timothy Johnson, not petitioner, took part in the Womble robbery and shootings. To the contrary, as respondent points out, in his statements to family members soon after the crime Duchine implicated petitioner, while at the same time trying to minimize petitioner's culpability. Duchine testified at his trial that he initially told his grandfather Mrs. Womble was killed when she grabbed at the shotgun petitioner was holding, causing it to fire. Thus, Duchine's trial testimony is hardly "dispositive" on the question of when Duchine first told his mother Timothy Johnson was the gunman. His trial testimony, consistent with his testimony before the referee, was that petitioner was the gunman.

Petitioner next takes exception to the referee's finding that "the concern mentioned by Duchine was more likely to be his fear that false testimony at the hearing [i.e., consistent with his declaration] could hurt his chances in other proceedings [rather than that any departure from his trial testimony would risk an adverse result in such proceedings]." Petitioner argues to the contrary that, "[m]oreover, [Duchine] acknowledged having told petitioner's investigators that he could be taken to court, and that all he was going to say was that the April 2, 1992, declaration was true—he was not going to say any more." We disagree with petitioner's suggestion that Duchine affirmed

to petitioner's investigators the truth of his declaration: Duchine testified, albeit somewhat equivocally, that he did *not* recall doing so. The investigators failed to take any notes of Duchine's supposed affirmation of his declaration, which, as the referee observed, raises questions about the weight to be given their testimony. Indeed, the one relevant investigative report in the record does not mention any such affirmation; petitioner's investigator merely reports Duchine said the declaration was all he was going to provide. We therefore conclude substantial evidence supports the referee's finding Duchine was more likely concerned that false testimony at the evidentiary hearing, rather than a (truthful) departure from his trial testimony, could jeopardize his chances of obtaining postconviction relief.

Petitioner further criticizes the finding that Duchine's hearing testimony was more credible than his declaration, contending Duchine lied when he testified he was illiterate at the time he signed the declaration. In fact, Duchine's Department of Corrections file shows he had, by the date of his declaration, earned a high school equivalency certificate through General Educational Development (GED) testing. As petitioner acknowledges, however, the referee did not accept Duchine's testimony at face value. The apparent implausibility of Duchine's claim of illiteracy at the time of his declaration does not compel rejection in toto of his hearing testimony; the referee's finding with respect to Duchine's credibility finds the requisite support in the record.

Duchine admitted at the hearing that, contrary to his trial testimony that he learned of the June 1986 shooting of Henderson ally Kenneth Moore (see *ante,* p. 454) only after the event, he in fact was present when Moore was shot, "covering" Timothy's "back." As respondent observes, however, at the hearing Duchine plausibly explained he saw no reason to implicate himself at trial in an unrelated and uncharged assault while attempting to defend himself against murder and attempted murder charges in the Womble case. Even if, as petitioner argues, the Kenneth Moore shooting was related to the Womble shootings insofar as both ultimately stemmed from rivalry among drug dealers in Easter Hill and the same weapon was used in both offenses, there nevertheless was substantial evidence to support the referee's finding that Duchine testified truthfully at both his trial and the evidentiary hearing when he named petitioner as the gunman in the Womble robbery murder.

Nor do the asserted inconsistencies between Duchine's trial testimony and his testimony before the referee on such collateral questions as whether he or Timothy sold drugs in Easter Hill, and the extent of Duchine's acquaintance with members of the Henderson family, dictate a finding that Duchine lied at both his trial and the instant hearing on the central issue of whether it was

petitioner or his brother who shot Willie Womble. In this vein, petitioner reads too much into certain of Duchine's testimony. For example, petitioner asserts that, at his trial, Duchine denied he knew Timothy was a drug dealer, only to admit at the hearing this denial was false. In fact, however, at his trial Duchine testified to the effect he did not know if Timothy was dealing drugs, while at the hearing he essentially stated that, although they were "all drug dealers," he did not recall actually *seeing* Timothy dealing dope in Easter Hill. Moreover, at his trial, as respondent points out, Duchine admitted selling, in 1986, rock cocaine that he acquired from the Hendersons, and otherwise revealed his knowledge of the drug trade in Easter Hill and its relevancy to the Kenneth Moore shooting.

Petitioner mischaracterizes the record in implying Duchine admitted at the hearing that he carried a 9-millimeter handgun in the Womble offenses. Duchine's reference to the 9-millimeter weapon was in connection with the Kenneth Moore shooting. Duchine's testimony at the hearing never contradicted his trial testimony that petitioner supplied the weapons just before the Womble shootings.[4]

Petitioner argues at length that Duchine's defense, i.e., that he was unaware until moments before the Womble robbery that any criminal activity was afoot, necessitated his falsely accusing petitioner of the crime, because Duchine's known association with Timothy Johnson prior to the robbery would have negated any hope of persuading the jury in his case that he was an innocent dupe. Petitioner also contends Duchine had an incentive to implicate petitioner in order to avoid impeachment with, or even prosecution for, the Kenneth Moore shooting, in which both he and Timothy had participated. Although these arguments are not utterly implausible, they are necessarily speculative and do not, in and of themselves, compel the conclusion Duchine testified falsely in crucial respects at the evidentiary hearing. After hearing the testimony regarding Duchine's association with Timothy Johnson, including the Kenneth Moore shooting, as well as the other evidence bearing on Duchine's credibility, the referee determined Duchine testified truthfully in recanting his declaration and adhering to his identification of petitioner as the second gunman in the Womble murder. The

---

[4]Petitioner asks this court to take judicial notice of Duchine's state and federal petitions for writ of habeas corpus. We summarily denied his state petition on October 29, 1997. Because Duchine's petitions and our order are proper subjects of judicial notice (Evid. Code, § 452, subd. (d)), we grant the request, although they do not materially assist us in resolving the issues before us.

Petitioner summarily contends the referee erred in denying his motion to recuse the Contra Costa County District Attorney's office from these proceedings. In the absence of any supporting authority or argument, the contention is not properly raised. (*People* v. *Ashmus* (1991) 54 Cal.3d 932, 985, fn. 15 [2 Cal.Rptr.2d 112, 820 P.2d 214].)

referee's conclusion is supported by substantial evidence on the record as a whole.

Petitioner takes exception to the referee's characterization of Duchine's testimony as "central" to petitioner's claim of innocence, citing his presentation of considerable other evidence regarding Timothy's involvement in planning the crime and Timothy's postoffense statements indicating he felt remorse or responsibility. What petitioner fails to acknowledge, however, is that if, as the referee found, Duchine—petitioner's coperpetrator and thus an eyewitness—testified truthfully petitioner was the shooter, then petitioner's claim of innocence must fail no matter how much circumstantial evidence petitioner presented concerning Timothy Johnson's involvement in the offense. Consequently, we see no flaw in the referee's characterization of Duchine's testimony as central to this case.

In his motion to reopen the evidentiary hearing, petitioner alleges there is newly discovered evidence showing Duchine lied when he testified before the referee that he executed his 1992 declaration because he felt pressure from others to spare petitioner from the death penalty. As petitioner points out, Duchine never specifically identified any person who threatened him, and he acknowledged that neither petitioner himself, nor petitioner's representatives, had ever directly done so. The referee, however, found Duchine's claim that he had been threatened, and felt "pressured," to be a plausible explanation why he executed the 1992 declaration. Petitioner now submits declarations by two prisoners who have been housed near Duchine and are acquainted with him, urging these declarations prove Duchine testified falsely.

In a declaration dated September 12, 1997, Gregory Piearson states under penalty of perjury that he was housed in state prison with Duchine from 1989 to 1992 and socialized with Duchine during that period. Piearson declares, inter alia, "I was close enough to the group from Richmond that I can say that I know that while I was in prison with Allie Duchine, he was not pressured to sign any documents, or do anything for Willie Johnson. . . . [¶] . . . [¶] I believe that I would have heard about it if Al Duchine was threatened at any time during the years 1989 into 1992 to sign anything for anyone. I believe that Duchine would eventually have come to me personally, or at least that I would have heard from him or his cellmate that he was getting threats. I never heard such information, Allie never talked to me about threats. Neither did his cellmate."

In a declaration dated September 12, 1997, Fahim Al Qaadir states under penalty of perjury that he is petitioner's cousin; he is currently incarcerated

in the California State Prison, Solano, as is Duchine; and he has seen and talked with Duchine from time to time. Al Qaadir declares he does not know about petitioner's case other than what he has heard while in prison. He further declares: "As far as I know, nobody has ever leaned on Allie in any way about Willie's case. Being the way prison is, I believe that I would have heard if this had happened." Al Qaadir also declares Duchine voluntarily has conversed on the telephone with petitioner's cousin Harvey Lacey, and states he has heard Duchine say, "he said what he said in court last year because he was worried about what was going to happen in his own case, and that he did not want to screw up his appeal."

These declarations fall short of establishing Duchine testified falsely when he claimed to have experienced pressure to sign the 1992 declaration. Although there is little reason to doubt either declarant honestly believes he would have become aware of any such pressure had it existed, neither alleges he was continuously in Duchine's presence or otherwise eliminates the possibility such threats or pressure could have been delivered to Duchine without the declarant's knowledge. Indeed, Duchine testified his awareness of the threats came through rumors, or "word on the street," rather than directly. Consequently, the declarations do not warrant reopening the hearing.

Petitioner takes exception to the referee's rejection of the testimony of witnesses who testified to Timothy Johnson's admissions regarding the Womble shootings. The referee found: "[T]he testimony about Timothy Johnson's 'admissions' regarding the Womble shooting is suspicious and therefore lacks credibility. First, the declarant is dead. Second, the witnesses who reported the confession have all previously been convicted of crimes involving moral turpitude. Third, the failure of the witnesses to come forward until years after the conviction and Timothy Johnson's death is not credibly explained."

Petitioner observes that several of the witnesses—Loreen Johnson, Timothy's widow; Zina Sims, petitioner's cousin; and Wanda Smith, Timothy's former girlfriend—had no criminal record.[5] Petitioner overlooks that none of those witnesses testified Timothy actually confessed to the shooting. At most, they testified that, before the crime, Timothy made statements indicating he planned to rob the Wombles or, after the fact, expressed remorse at the way matters eventuated with petitioner's arrest and conviction. Loreen Johnson, Timothy's widow, testified her husband and John Allen Duchine discussed in her presence a plan to commit a robbery at the Womble

---

[5] Although at one point in his brief petitioner represents Barbara Nichols had no criminal record, she admitted having been convicted of offenses involving moral turpitude.

residence. Zina Sims, petitioner's cousin, testified Timothy told her he and John Allen Duchine planned to rob Terrance Henderson of money Henderson kept at the Womble house. Wanda Smith, Timothy's former girlfriend, testified that, after the Womble shootings, Timothy admitted having planned the robbery with Duchine and stated, "[I]t weren't supposed to go like that, wasn't nobody supposed to die." Such statements do not exonerate petitioner, although they certainly suggest Timothy took part in planning the robbery. That the witnesses testifying to these *admissions* lacked criminal records does not undermine the referee's disbelief of witnesses who did have such records and who testified to Timothy's purported *confessions*.

Petitioner also points out that the witness whose testimony the referee chose to credit—John Allen Duchine—also had been convicted of crimes involving moral turpitude. Clearly, however, the referee did not reject the testimony of petitioner's witnesses solely because they had suffered such convictions; the referee also relied on their lengthy delay in coming forward.

Moreover, the referee found the testimony of King Arthur Wilson and Barbara Nichols "implausible in material details, as well as inconsistent internally and in relation to the witnesses' prior statements." Although petitioner takes exception to this finding, we find substantial evidence in the record to support the referee's assessment. Wilson testified at the evidentiary hearing that Timothy Johnson told him, "I'm the one who shot them broads," but his 1992 declaration made no mention of such a statement, and he admitted speaking with a defense investigator in August 1996 about his conversations with Timothy Johnson without mentioning the statement about shooting the "broads." The referee reasonably could choose not to credit Wilson's explanation that he failed to mention the statement because he felt the term "broads" was unduly "harsh." The referee further could find implausible Wilson's testimony that, as time goes on, he remembers more and more, given that Wilson also expressed difficulty recalling the circumstances under which his declaration was prepared.

Similarly, substantial evidence supports the referee's finding the testimony of Barbara Nichols was unworthy of belief. To cite but one example: Nichols testified before the referee that Timothy Johnson tape-recorded a confession to the Womble shootings and instructed her to mail the tape to "the Marin County Police Department" in the event of his death. She claimed to have done so by enclosing the tape in an envelope, labeling it "Marin Police Department" but apparently failing to address it, and dropping it in a mailbox. In her declaration, however, Nichols stated Timothy refused to make such a recording, a statement corroborated by the notes of a defense investigator. At the evidentiary hearing, Nichols denied making such a statement. These and other inconsistencies amply support the referee's rejection of Nichols's testimony.

CONCLUSION

■   Petitioner devotes a substantial portion of his briefing to an outline of the evidence, adduced at the hearing before the referee, of Timothy Johnson's involvement in the drug trade in Easter Hill, ownership of the shotgun that killed Mrs. Womble, statements of intention to rob the Wombles of money he believed they held for the Hendersons, reputation for violence, and history of committing home invasions and robberies of drug dealers. We agree, however, with the referee's finding that "the evidence of who planned the robbery and the reasons for its commission are not dispositive of the identity of the actual perpetrators. More credible, in my view, is the testimony of [John Allen] Duchine at the evidentiary hearing that petitioner, not Timothy Johnson, participated in the crime, a fact not inconsistent with the possibility of Timothy Johnson being the mastermind behind the robbery and later expressing regret that its commission entangled his brother in a capital crime." Petitioner asserts the evidence showing Timothy Johnson planned the Womble robbery means "nothing remains of the case against petitioner." To the contrary: There remain the trial testimony of the surviving victim, Angela Womble, and the hearing testimony of petitioner's accomplice, John Duchine, that petitioner fired the shots, as well as the trial testimony of Ketcia Hawkins and Zina Sims placing petitioner and Duchine together soon after the crime. Although petitioner continues to attack the reliability of Angela Womble's identification and the truthfulness of Duchine's testimony, we are satisfied they provide sufficient evidentiary support for his conviction. To put it another way, petitioner has failed, as the referee found, to sustain his burden of establishing his innocence by demonstrating Timothy Johnson's guilt.

DISPOSITION

Having found substantial evidence to support the referee's findings, we conclude petitioner has failed to establish he is entitled to relief. Accordingly, we deny the motion to reopen the evidentiary hearing and the petition for writ of habeas corpus and discharge the order to show cause.

George, C. J., Mosk, J., Kennard, J., Baxter, J., Chin, J., and Brown, J., concurred.

Petitioner's application for a rehearing was denied September 23, 1998, and the opinion was modified on September 23, 1998, and October 21, 1998, to read as printed above.