174 Cal.App.4th 743 (2009)
THE PEOPLE, Plaintiff and Respondent,
v.
TYRONE EBANIZ, Defendant and Appellant.
In re TYRONE EBANIZ on Habeas Corpus.
Nos. F054696, F055939.
Court of Appeals of California, Fifth District.
June 3, 2009.
CERTIFIED FOR PARTIAL PUBLICATION[*]
*748 Joseph Shipp, under appointment by the Court of Appeal, for Defendant and Appellant.
Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kathleen A. McKenna and Brian Alvarez, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION
ARDAIZ, P. J.
In the published portion of this opinion, we hold that Tyrone Ebaniz has presented newly discovered evidence that points unerringly to actual innocence, and so is entitled to a reversal of his previously affirmed convictions and a new trial thereon. In the unpublished portion, we hold that when a judgment in a criminal case is affirmed as to some counts, but is remanded for resentencing or, at the district attorney's election, retrial on one or more reversed counts, the defendant is not subsequently entitled to move for a new trial on the counts as to which the convictions were affirmed.[1]

FACTS AND PROCEDURAL HISTORY[2]
On January 24, 2001, 17-year-old Eric Jones was lured to the garage of Juan Soto's residence in Delano. There, he was beaten, sodomized with a wooden squeegee handle, and shocked with electricity. He was then placed inside the trunk of a car and driven to a rural area in Tulare County, where he was shot multiple times and killed. His bound, nude body was dumped alongside the road. Investigation focused on a group of Jones's acquaintances, who, like Jones, lived in or near Delano: Gerardo Zavala, Keith Seriales, and Jorge Vidal, all of whom were in their late 20's or 30's; brothers Juan and Gerardo Soto, also adults; Daniel Portugal, who was 17; and Ebaniz, who was 16 years old at the time of the killing and Jones's best friend. Several days after the body was found, Ebaniz confessed to the police, leading to the eventual arrests of all except the Soto brothers, who fled to Mexico. (Ebaniz II, supra, F047859.)
*749 Ebaniz was charged with first degree murder committed during the course of a kidnapping and involving torture (Pen. Code,[3] §§ 187, 190.2, subd. (a)(17), (18)), felony false imprisonment (§ 236, torture (§ 206), and kidnapping (§ 207). It was further alleged that a principal was armed with a handgun and assault rifle during commission of the crimes (§ 12022, subd. (a)(1), (2)), and that Ebaniz personally used a deadly or dangerous weapon during commission of torture (§ 12022, subd. (b)). He was tried separately.
At Ebaniz's first trial, the prosecutor presented multiple theories of liability to the jury. While never contending Ebaniz was the actual killer, the prosecutor argued that he was guilty of murder under principles of aiding and abetting and conspiracy, each supplemented with the natural and probable consequences doctrine. The prosecutor asserted Ebaniz aided and abetted or conspired to commit the charged crime of false imprisonment or the uncharged crime of assault, and that murder, kidnapping, and torture were natural and probable consequences of the target crimes. The prosecutor also argued four separate theories to support the first degree murder charge: premeditation and deliberation, conspiracy to commit felony murder (predicated upon the target crimes of assault, false imprisonment, and torture), felony murder during the course of a kidnapping, and torture murder. Ebaniz did not dispute that he was present during the ordeal, but denied possessing the intent to commit any of the charged crimes. He argued there was no evidence he conspired with the others to harm Jones, and claimed his acts of participation were committed under duress, emphasizing that he had been punched by Vidal and that others were armed. He pointed to his actions of trying to run from the garage when he saw Jones being beaten (whereupon Portugal pointed a gun at him) and vomiting when Vidal sodomized Jones with the stick, as showing he was not involved in any preconceived plan to harm Jones. (Ebaniz I, supra, F042769.) Ebaniz's evidence in this regard consisted primarily of his statements to police.
A jury convicted Ebaniz as charged and found true the special allegations.[4] He was sentenced to a total term of 34 years to life in prison. (Ebaniz I, supra, F042769.) On appeal, we reversed the murder conviction due to instructional error (specifically, the inclusion of non-section-189 offenses in CALJIC No. 8.26 [first degree felony murderin pursuance of a conspiracy]), afforded the district attorney the opportunity to retry the murder count, and affirmed the remaining convictions.[5] (Ebaniz I, supra, F042769.)
*750 The district attorney elected to retry the murder charge. Upon retrial, the prosecutor proceeded on the premise that Ebaniz, while not the actual killer, nonetheless was guilty of first degree murder based on principles of aiding and abetting and conspiracy liability, coupled with the natural and probable consequences doctrine. Accordingly, jurors were instructed on those principles, along with five theories of first degree murder: murder in furtherance of conspiracy to torture, murder by means of lying in wait, murder by means of torture, felony murder based on kidnapping, and premeditated murder. The defense relied in large part on evidence (especially Portugal's videotaped statement to police, which was not presented at Ebaniz's first trial, but which the parties stipulated could be admitted at the retrial) suggesting Ebaniz participated in the events under duress. (Ebaniz II, supra, F047859.)
Evidence was presented that Ebaniz initially told police he and Jones were going to Gerardo Soto's house to get some drugs. Ebaniz denied knowing anything was going to be done to Jones. He subsequently said he was waiting outside his grandmother's house for Jones, who had said he was going to stop by, when Gerardo Soto and another man drove past. They started talking, and Soto invited Ebaniz into the car. Ebaniz ultimately said he had been sitting in a car with Zavala and Gerardo Soto for about 20 minutes before Jones arrived. Jones asked where "the shit" was, and Ebaniz asked how much money he had. When Jones answered, Ebaniz nodded to him to get into the car. They then drove to the house. Once inside the garage, Zavala suddenly started to beat Jones. Ebaniz tried to run, but Portugal pointed an AK-47 at him and told him not to move. Gerardo Soto took the gun and pointed it at Jones, but then pointed it back at Ebaniz and told him to do as he was told. When Vidal arrived, he ordered Ebaniz to stab and kick Jones. When Ebaniz refused, Vidal struck him in the mouth with his fist, knocking him to the floor. Gerardo Soto had Ebaniz go inside the house. He subsequently told Ebaniz to come back into the garage. By then, a stick had been inserted in Jones's anus. Vidal ordered Ebaniz to "`[d]o it,'" but Ebaniz refused. Vidal insisted, and Portugal was nearby, holding the AK-47. They stepped toward Ebaniz and Vidal again gave the order. Ebaniz moved the stick once, then Vidal began to move it. Ebaniz threw up and returned to the house. Later, Vidal made Ebaniz write on Jones's back. After Vidal shot Jones, he warned Ebaniz not to say anything or he (Vidal) would get Ebaniz's whole family. (Ebaniz II, supra, F047859.)
In Portugal's statement to police, Portugal related that Jones was to be beaten up as punishment for his part in a burglary, and that Ebaniz was going *751 to lure Jones out of his house so the beating could occur. Portugal confirmed that Ebaniz tried to run when the others began beating Jones, and that Portugal pointed an AK-47 at him. Portugal also related that Ebaniz asked to be let go, but that Portugal would not allow him to leave. Portugal further confirmed that Ebaniz did not want to participate in the sodomy, but that Vidal insisted, and that Ebaniz did not participate in shocking Jones with electricity and was scared. (Ebaniz II, supra, F047859.)
The jury again convicted Ebaniz of first degree murder and found true the arming allegations, and Ebaniz was sentenced accordingly. (Ebaniz II, supra, F047859.) He again appealed, and we again concluded the murder conviction must be reversed, this time due to the failure of the various instructions to convey the applicability of duress as a defense to murder, predicated on a theory of murder in furtherance of a conspiracy to commit a felony other than murder, by negating the underlying felony. (Ebaniz II, supra, F047859.)
The district attorney again elected to retry the murder count. In this trial (which gave rise to the instant proceedings), the prosecutor relied on essentially the same evidence as was presented in the earlier trials, but proceeded on the narrower theories that Ebaniz was guilty, as an aider and abettor, of murder by means of torture, murder by means of lying in wait, or premeditated murder. The defense declined to stipulate to admission of Portugal's statement, but instead presented the testimony of Keith Seriales, whose own convictions for special circumstance murder and related offenses arising out of the death of Eric Jones had recently been affirmed by this court.[6]
According to Seriales, Ebaniz was present during the events that occurred in Juan Soto's garage, but the majority of the time, he was inside the house with Seriales. He stayed there except when Vidal or someone else called him back to the garage. Someone was always with Ebaniz, watching him.
Ebaniz never told Seriales that he knew this was going to happen, but Seriales did not know how Jones got there or how anything happened before he himself arrived. He and Vidal were at Seriales's house when Seriales received a telephone call in which he was told "they" had Jones at Juan Soto's house and to bring Vidal over. When he and Vidal arrived, Juan Soto was in the living room. He pointed toward the garage. Gerardo Soto, Zavala, Ebaniz, and Portugal were already in the garage, and Jones was tied up in the middle of the room. Ebaniz was standing by a car, looking scared. It did not appear to Seriales that Ebaniz was part of any plan.
*752 Vidal started hitting Jones. After he stopped, one of the Soto brothers showed Vidal a screwdriver, and Vidal struck Jones with it once or twice. He then told Ebaniz to do it and, when Ebaniz refused, struck him and knocked him down. Seriales told Vidal to "kickback." Zavala and someone else said Ebaniz was the one who had brought Jones there. Ebaniz was made to touch the stick in Jones's rectum and to write on Jones. After Vidal made him touch the stick, Ebaniz ran behind a car and Seriales saw him throw up. At some point, Ebaniz, Portugal, and Vidal shocked Jones with electricity. Vidal, who had a gun with him, basically threatened Ebaniz to make him plug in the cord. Portugal and Gerardo Soto were sharing an AK-47 while in the garage. They pointed it toward Jones, and Vidal threatened Ebaniz and his family. Ebaniz, who never had a gun, was very scared. His eyes were watery. Seriales could see that he did not want to do the things he was made to do. Sometimes he said he did not want to do it, but Vidal, who was crazy that evening, was prodding him to do things. Vidal repeatedly said, in everyone's presence, that he was going to kill Jones. When Jones was taken out into the country, Vidal wanted to kill Ebaniz as well. Throughout the evening, he had been saying that Ebaniz was weak. Vidal was afraid he would talk. Ebaniz did not take part in the shooting, but instead could not believe what was happening and was very quiet.
Jurors were instructed, inter alia, on the prosecution's theories. They were also instructed on conspiracy to commit murder, but only in the context of considering statements made by a purported coconspirator.[7] An instruction on duress was given, but it informed jurors that the defense did not apply to the crime of murder, and the prosecutor emphasized that point.[8] After deliberating just over an hour, the jury acquitted Ebaniz of both first and second degree murder.
In light of the fact Seriales's testimony was not presented at his earlier trials, Ebaniz moved for a new trial or, alternatively, for a modification of the verdicts, on the counts as to which the convictions were upheld on his first appeal. Alternatively, he requested the appointment of habeas corpus counsel. Following opposition by the People, the trial court denied the new trial motion as untimely. It did not rule on the requested appointment of counsel. Ebaniz was sentenced to prison for a total determinate term of nine years and a concurrent indeterminate term of life plus one year. He was also ordered to pay restitution, as well as various fees and fines.
*753 Ebaniz appealed, challenging denial of his new trial motion and raising claims of sentencing error. He also requested, and we granted, expansion of appellate counsel's appointment to encompass a petition for writ of habeas corpus by which to raise the claim of newly discovered evidence. Following filing of the petition, we obtained an informal response from the Attorney General and an informal reply to that response. On March 13, 2009, we issued an order to show cause. The parties elected not to file further pleadings, but instead to rely on their informal response and reply.[9]
Ebaniz seeks reversal of his convictions, and a new trial, on the false imprisonment, torture, and kidnapping counts and related special allegations that were affirmed in Ebaniz I. He says that Seriales's in-person confirmation of duress at Ebaniz's third trial constitutes newly discovered evidence that points to actual innocence and confirms the inaccuracy and unfairness of the first trial. The Attorney General responds that the evidence was neither newly discovered nor does it sufficiently show Ebaniz is actually innocent. As we will explain, we conclude Ebaniz must be afforded a new trial.

DISCUSSION

I[*]

II

EBANIZ HAS PRESENTED NEWLY DISCOVERED EVIDENCE WARRANTING HABEAS CORPUS RELIEF.
Whatever the concept of justice among civilized members of the human race, it cannot be denied that its credibility relies on assurance of confidence in the findings of facts upon which its consequences rely. While justice is a process rather than a result, it is fundamental to the American system of justice that our abhorrence at convicting the innocent may sometimes result in the guilty escaping punishment. We have long ago concluded that if some who are guilty occasionally escape punishment, it is not regrettable so long as those who are innocent also escape condemnation. On balance we accept that *754 punishment of the innocent is a far greater indictment of a system of justice than failure to always ferret out the guilty.
Even with all our procedural protections and adherence to constitutional principles, the system of justice is not infallible. But more importantly, when its fallibility is brought to light, the fact that process has been followed cannot justify exalting procedure over substance. Even when guilt is "final" in the sense that it is established by a verdict that has the benefit of correct process, that verdict is undermined if there is new evidence that points unerringly to innocence. There is no credibility in a justice system that allows the potential for actual innocence to be the victim of process duly followed. We must act when guilt is clearly called into question and the probability of innocence becomes a matter of reality rather than speculation. That is the issue presented in the case before us, a case duly tried, duly affirmed on appeal and now before us on a petition for writ of habeas corpus.
(1) "Our state Constitution guarantees that a person improperly deprived of his or her liberty has the right to petition for a writ of habeas corpus. [Citations.]" (People v. Duvall (1995) 9 Cal.4th 464, 474 [37 Cal.Rptr.2d 259, 886 P.2d 1252].) "`Habeas corpus will lie to vindicate a claim that newly discovered evidence demonstrates a prisoner is actually innocent.' [Citation.]" (In re Lawley (2008) 42 Cal.4th 1231, 1238 [74 Cal.Rptr.3d 92, 179 P.3d 891] (Lawley).)
Our issuance of an order to show cause in this matter constituted a preliminary determination that Ebaniz made a sufficient prima facie statement of facts that, if established, entitle him to relief. (In re Large (2007) 41 Cal.4th 538, 549 [61 Cal.Rptr.3d 2, 160 P.3d 662]; see People v. Romero (1994) 8 Cal.4th 728, 737-738 [35 Cal.Rptr.2d 270, 883 P.2d 388].) That determination, however, is not final; Ebaniz must now prove the facts on which his claim depends. (Large, at p. 549.)
(2) Ordinarily, the standard of proof applicable to a habeas corpus claim is preponderance of the evidence. (E.g., In re Large, supra, 41 Cal.4th at p. 549; In re Cudjo (1999) 20 Cal.4th 673, 687 [85 Cal.Rptr.2d 436, 977 P.2d 66]; In re Sodersten (2007) 146 Cal.App.4th 1163, 1223 [53 Cal.Rptr.3d 572].) A different, higher standard is applied to actual innocence claims, however. (Lawley, supra, 42 Cal.4th at p. 1240.) Generally, habeas corpus claims must surmount the presumption of correctness accorded criminal judgments rendered after procedurally fair trials. (Ibid.) "`For purposes of collateral attack, all presumptions favor the truth, accuracy, and fairness of the conviction and sentence; defendant thus must undertake the burden of overturning them. Society's interest in the finality of criminal proceedings so demands, and due process is not thereby offended.' [Citation.]" (People v. *755 Duvall, supra, 9 Cal.4th at p. 474.) "Unlike claims directed at prosecutorial, judicial, juror, or defense counsel misconduct, however, actual innocence claims based on either newly discovered or nonperjured false evidence do not attack the procedural fairness of the trial. They concede the procedural fairness of the trial, but nevertheless attack the accuracy of the verdict rendered and seek a reexamination of the very question the jury or court has already answered: Is the defendant guilty of the charges presented? A conviction obtained after a constitutionally adequate trial is entitled to great weight. Accordingly, a higher standard properly applies to challenges to a judgment whose procedural fairness is conceded than to one whose procedural fairness is challenged. [Citations.] Metaphorically, an actual innocence claim based on newly discovered evidence seeks a second bite at the apple, but unlike an ineffective assistance of counsel claim, for example, it does not contend the first bite was rotten." (Lawley, supra, 42 Cal.4th at pp. 1240-1241.)
Ebaniz says he is claiming "the first bite was rotten," because he is asserting both actual innocence and an unfair first trial; hence, the higher standard should not apply in this case. He also says the standard should not apply because his claim is more closely related to an ongoing retrial and new trial motion than it is to one in which new evidence is offered years later to open a long-final conviction. We conclude the higher standard applies. To the extent they are cognizable, Ebaniz's claims of unfairness are inextricably intertwined with his claim of newly discovered evidence.[12] Moreover, his convictions for false imprisonment, torture, and kidnappingthe ones he attacks in this proceedinghave been final for several years.
We address the heightened standard, post. As an initial matter, however, we must determine whether Seriales's testimony constitutes newly discovered evidence.
In the context of a habeas corpus claim, "`"newly discovered evidence" is evidence that could not have been discovered with reasonable diligence prior to judgment.' (§ 1473.6, subd. (b).)" (In re Hardy (2007) 41 Cal.4th 977, 1016 [63 Cal.Rptr.3d 845, 163 P.3d 853].) At the time of Ebaniz's first trial, *756 Seriales was in custody, had been charged with special circumstance murder and other offenses arising out of Eric Jones's death, and was facing the death penalty. (See People v. Seriales, supra, F049062.) That he would not have testified at Ebaniz's first trial is evident.
Relying on California and federal authorities construing the meaning of "newly discovered evidence" in the context of new trial motions, the Attorney General says that while Seriales's testimony may have been newly available, it was not newly discovered, as his statement was known to Ebaniz before Ebaniz's first trial. (E.g., People v. Corona (1965) 238 Cal.App.2d 914, 920 [48 Cal.Rptr. 193]; U.S. v. Theodosopoulos (7th Cir. 1995) 48 F.3d 1438, 1448-1449; U.S. v. Muldrow (10th Cir. 1994) 19 F.3d 1332, 1339; U.S. v. Dale (D.C. Cir. 1993) 301 U.S. App.D.C. 110 [991 F.2d 819, 838-839]; U.S. v. DiBernardo (11th Cir. 1989) 880 F.2d 1216, 1224-1225; U.S. (9th Cir. 1981) 649 F.2d 731, 739-740.) Pointing to Lawley, supra, 42 Cal.4th 1231, Ebaniz counters that Seriales's testimony is newly discovered because it could not have been produced by Ebaniz earlier. The Attorney General takes issue with this assertion; he says the evidentiary hearing in Lawley occurred because the People did not object to it, and the case does not hold that newly available testimony qualifies as newly discovered evidence.
In Lawley, Brian Seabourn shot and killed a man, for which he was convicted of second degree murder. Lawley was convicted of murder and sentenced to death for hiring Seabourn and another to kill the victim. After Lawley's conviction and sentence were affirmed on appeal, he filed a petition for writ of habeas corpus in which he asserted he was factually innocent because Seabourn shot the victim at the behest of the Aryan Brotherhood. Lawley supported this assertion with, inter alia, a declaration from Seabourn stating that Lawley was not involved in the murder. (Lawley, supra, 42 Cal.4th at pp. 1233-1234.) The California Supreme Court issued an order to show cause with respect to Lawley's claim of actual innocence. As described by the court, "In their return, the People, represented by the Attorney General, conceded that Seabourn's statements, if true, would establish Lawley's innocence. Consequently, the Attorney General did not object to an evidentiary hearing; because Seabourn had been awaiting trial at the time of Lawley's trial and had thus been rendered unavailable because of his constitutional privilege not to testify, Lawley had never had a judicial forum in which to proffer such testimony establishing his innocence." (Id. at p. 1237.)
We believe Lawley supports Ebaniz's position. Although the Attorney General did not object to an evidentiary hearing in that case, there is no suggestion such an objection or any lack of concession concerning the import of Seabourn's statements would have caused the Supreme Court to summarily *757 deny the writ petition. Elsewhere in the opinion, the court observed: "[W]e issued an order to show cause and ordered an evidentiary hearing because Lawley submitted newly discovered evidence, evidence unavailable at the time of trial because of Brian Seabourn's constitutional privilege not to testify, that, if credited, suggested Lawley was factually innocent of the crime for which he had been convicted." (Lawley, supra, 42 Cal.4th at p. 1238, italics added.)
The Attorney General also argues Ebaniz failed to act with reasonable diligence because he tried neither to call Seriales as a witness nor to proffer Seriales's statement as a declaration against penal interest or under some other hearsay exception. Attempting to call Seriales as a witness would have been, at the time of Ebaniz's first (and even second) trial, an exercise in futility: It defies reason to believe someone facing the death penalty would have, in a trial prior to his own, placed himself at the scene of the crime.[13]
(3) It would also have been futile for Ebaniz to proffer Seriales's statement as a declaration against penal interest. In this regard, Seriales's statement was hearsay and, as such, was presumptively inadmissible. (Evid. Code, § 1200, subds. (a), (b).) Evidence Code section 1230 creates an exception to this rule for declarations against interest.[14] (People v. Jackson (1991) 235 Cal.App.3d 1670, 1677 [1 Cal.Rptr.2d 778].) In pertinent part, that statute provides: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of . . . criminal liability, . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." (Evid. Code, § 1230.)
As Seriales assuredly would have asserted his Fifth Amendment privilege not to testify, he was "unavailable" within the meaning of the statute. (People v. Fuentes (1998) 61 Cal.App.4th 956, 961-962 [72 Cal.Rptr.2d 237].) Evidence Code section 1230 does not apply, however, "to evidence of any statement or portion of a statement not itself specifically disserving to the interests of the declarant." (People v. Leach (1975) 15 Cal.3d 419, 441 [124 Cal.Rptr. 752, 541 P.2d 296], fn. omitted.) Although Seriales's overall statement was obviously inculpatory from his standpoint, as it admitted his presence at the scenes of Jones's torture and murder and at least limited *758 participation in events, we fail to see how those portions of the statement dealing with Ebaniz were specifically disserving to Seriales. Accordingly, the bulk of those portions of the statement that were relevant to Ebaniz's case, and especially to his claim of duress, were not admissible as declarations against Seriales's penal interest. We conclude Ebaniz was not required to proffer inadmissible evidence before we may find he acted with reasonable diligence. (See People v. Shoals (1992) 8 Cal.App.4th 475, 487 [10 Cal.Rptr.2d 296].)
(4) In In re Branch (1969) 70 Cal.2d 200 [74 Cal.Rptr. 238, 449 P.2d 174], the California Supreme Court stated: "[I]t is so fundamentally unfair for an innocent person to be incarcerated that he should not be denied relief simply because of his failure at trial to present exculpatory evidence. Thus, the term `new evidence' . . . should be held to include any evidence not presented to the trial court and which is not merely cumulative in relation to evidence which was presented at trial. This does not mean that a defendant is entitled to a hearing on habeas corpus merely by producing some evidence tending to show his innocence not presented at his trial. [California Supreme Court decisions] specify stringent standards regarding the character of new evidence which will warrant a hearing on habeas corpus."[15] (Id. at p. 214.) The court subsequently explained that this "language should not be read to imply that a petitioner may routinely use habeas corpus proceedings to reassess unsuccessful tactical decisions at trial; the expressed concern is for the innocent defendant. Accordingly, a habeas corpus petitioner must first present newly discovered evidence that raises doubt about his guilt; once this is done, he may introduce `any evidence not presented to the trial court and which is not merely cumulative in relation to evidence which was presented at trial' [citation] insofar as it assists in establishing his innocence. Being mindful of the convicted defendant's opportunity to challenge his attorney's competence in failing to investigate or present obviously exculpatory evidence [citations], we perceive no danger that this interpretation will deprive any wrongfully convicted person of the opportunity to establish his innocence." (In re Hall (1981) 30 Cal.3d 408, 420 [179 Cal.Rptr. 223, 637 P.2d 690].)
In our view, if the content of Seriales's testimony meets the standard applicable to an actual innocence habeas corpus claim, discussed post, it would be manifestly unfair to preclude its use on the ground that its content was known to Ebaniz, even though he had absolutely no means of presenting *759 it in his defense.[16] This is especially true since Seriales's testimony, which focused on Ebaniz's conduct, went well beyond Seriales's statement to police, which did not.
(5) Having determined Seriales's testimony qualifies as newly discovered evidence, we now turn to whether it is sufficient to warrant the granting of relief. "The standard for determining whether to afford prisoners habeas corpus relief on the ground that newly discovered evidence demonstrates actual innocence is . . . established. Under principles dating back to In re Lindley (1947) 29 Cal.2d 709 [177 P.2d 918], `[a] criminal judgment may be collaterally attacked on habeas corpus on the basis of newly discovered evidence if such evidence casts "fundamental doubt on the accuracy and reliability of the proceedings. At the guilt phase, such evidence, if credited, must undermine the entire prosecution case and point unerringly to innocence or reduced culpability. [Citations.]" [Citation.][17] "[N]ewly discovered evidence does not warrant relief unless it is of such character `as will completely undermine the entire structure of the case upon which the prosecution was based.'" [Citation.]' [Citations.]" (Lawley, supra, 42 Cal.4th at pp. 1238-1239.) A petitioner carries a "heavy burden of demonstrating he is actually innocent. `"Depriving" an accused of facts that "strongly" raise issues of reasonable doubt is not the standard. Where newly discovered evidence is the basis for a habeas corpus petition, as alleged by defendant, the newly discovered evidence must "undermine[] the prosecution's entire case. *760 It is not sufficient that the evidence might have weakened the prosecution case or presented a more difficult question for the judge or jury. [Citations.]" [Citation.]' [Citations.]" (In re Hardy, supra, 41 Cal.4th at p. 1017.) "If `a reasonable jury could have rejected' the evidence presented, a petitioner has not satisfied his burden. [Citation.]" (Lawley, supra, at p. 1239.)
(6) We do not read this last sentence as requiring us to find that the evidence is irrefutable or that it is such that no reasonable jury could, upon being presented with it, convict the defendant. Such a standard would conflict with the factfinding function that is accorded to a jury as trier of fact, and not to this court. When presented with a claim of newly discovered evidence, our role in evaluating the nature of the evidence is that of a reviewing court, and not of a finder of fact. We necessarily are limited to the written record. We are not privy to the witnesses' actual testimony, and cannot view their demeanor or assess the myriad other subtle factors that inform a juror's decision of what and whom to believe. Moreover, no evidence is irrefutable; even something seemingly as unassailable as DNA evidence or a complete confession is always open to some sort of attack or rejection by a jury.
Furthermore, if the new evidence had to be such that it entitled a defendant to an acquittal as a matter of law, as by rendering the evidence insufficient to convict, the appropriate remedy on habeas corpus would seem to be to direct entry of a judgment of acquittal. Such is not the law. "[A] successful habeas corpus petition necessarily contemplates and virtually always permits a retrial. [Citations.]" (In re Cruz (2003) 104 Cal.App.4th 1339, 1347 [129 Cal.Rptr.2d 31].) This is because "a habeas corpus proceeding is not a trial of guilt or innocence and the findings of the habeas corpus court do not constitute an acquittal. The scope of a writ of habeas corpus is broad, but . . . it is designed to correct an erroneous conviction. It achieves that purpose by invalidating the conviction and restoring the defendant to the position he or she would be in if there had been no trial and conviction. [Citations.] [¶] Thus, the conviction is set aside but the prosecution is not ended." (Id. at p. 1346.)
Accordingly, we conclude it is not our function to decide whether Ebaniz should be acquitted or to direct a verdict on the question of his guilt; to do so would usurp the jury's role. Rather, we believe the standard requires us to have a heightened level of confidence in the credibility and substance of the new evidence. We must be able to say more than just that a reasonable juror could believe it or that it conflicts with the trial evidence and would have presented a more difficult question for the jury (see In re Wright (1978) 78 Cal.App.3d 788, 802 [144 Cal.Rptr. 535]), or that a fact finder presented with such evidence might reach a different conclusion than did the juries at Ebaniz's first two trials.
*761 (7) California Supreme Court authority supports our position. For instance, in In re Weber (1974) 11 Cal.3d 703 [114 Cal.Rptr. 429, 523 P.2d 229], that court stated: "[N]ewly discovered evidence will not undermine the case of the prosecution so as to warrant habeas corpus relief unless (1) the new evidence is conclusive, and (2) it points unerringly to innocence." (Id. at p. 724.) The court referred to a confession by a third party exonerating the petitioner as pointing unerringly to innocence and, if credited, undermining the prosecution's entire case. (Ibid.) The court went on to observe that a posttrial offer by a witness to recant his or her sworn testimony is always viewed with suspicion, and that a court may reject such evidence if the court deems it to be unworthy of belief. (Id. at pp. 724-725.) In making this determination, the court can take into account such things as a comparison of conflicting statements, and the likelihood of the retraction in relation to the circumstances under which it was made and in light of the trial evidence. (Id. at p. 725.)
In In re Johnson (1998) 18 Cal.4th 447 [75 Cal.Rptr.2d 878, 957 P.2d 299], our state high court acknowledged that in In re Weber, supra, 11 Cal.3d at page 724 and In re Hall, supra, 30 Cal.3d at page 423, it articulated the standard that evidence supporting claims of actual innocence must be conclusive and point unerringly to innocence, but explained: "We rejected, however, the suggestion that this standard imposes `either the hypertechnical requirement that each bit of prosecutorial evidence be specifically refuted, or the virtually impossible burden of proving there is no conceivable basis on which the prosecution might have succeeded. It would be unconscionable to deny relief if a petitioner conclusively established his innocence without directly refuting every minute item of the prosecution's proof, or if a petitioner utterly destroyed the theory on which the People relied without rebutting all other possible scenarios which, if they had been presented at trial, might have tended to support a verdict of guilt.' [Citations.]" (Johnson, at p. 462.)
(8) In our view, then, the evidence must be so credible and substantial that it completely undermines our confidence in the guilty verdicts obtained without that evidence. It must have an aura of trustworthiness about it that, when considered in conjunction with all the other evidence in the case, is compelling. We must be able to conclude that, in light of the evidence already presented at trial, the newly discovered evidence has such truthfulness and compelling force that, if believed by the trier of fact, it could only result in a verdict more favorable to the defendant, as it did here in Ebaniz's third trial.
The Attorney General's argument notwithstanding, Seriales's testimony meets this standard, at least with respect to evidence Ebaniz acted under duress. We recognize that Seriales attempted to minimize his own culpability. Significantly, however, his testimony concerning Ebaniz being struck by *762 Vidal, forced to participate in what was done to Jones, and vomiting, was consistent with his statement to police. Seriales's statement to police was consistent, as to those details, with Ebaniz's statements;[18] it was consistent, as to Portugal having an AK-47 and Ebaniz being forced to participate, with Portugal's statement to police (in which Portugal confirmed Ebaniz's claim that Portugal had pointed a gun at him when Ebaniz tried to run); and it was consistent, as to Ebaniz being forced to participate, with Zavala's statement to police. Thus, we are confronted not merely with testimony given by a witness after he has had, for example, an opportunity to conform that testimony to the statement of someone he is trying to help, but testimony that is consistent with, and corroborated by, statements given before any such opportunity arose. Additionally, we cannot ignore the fact that, although Seriales apparently was acquainted with Ebaniz's father, there is no evidence to suggest the relationship between Ebaniz and Seriales was sufficiently close that Seriales would lie for Ebaniz. This is especially true when we take into account that Ebaniz was the person whose statements to police led to Seriales's arrest.
If believed, the new evidence completely undermines the prosecution's entire case and points unerringly to innocence. Seriales's testimony established that once Jones was brought to the Soto house, Ebaniz acted under duress. Accordingly, Ebaniz's criminal liabilityif anyhad to be predicated on his aiding and abetting or conspiring to commit false imprisonment and/or assault prior to arriving at the garage, with what happened after arrival (torture and kidnapping) as the natural and probable consequence thereof.
Seriales testified that when he himself arrived at the Soto residence with Vidal, Ebaniz looked scared and it did not appear he was part of some plan. Seriales did not know, however, how Jones got to the house or how anything happened before Seriales and Vidal arrived. Understandably seizing on this, the Attorney General says Seriales's testimony did not undermine the prosecutor's theory of guilt. He argues: "[T]he uncontradicted evidence shows [Ebaniz] lured Jones to the garage where he knew dangerous men with real grudges wanted to capture and seriously assault Jones. That [Ebaniz] later appeared fearful does not absolve him of criminal liability for luring Jones to his torture. Indeed, there was no evidence that [Ebaniz] was forced to lure Jones to the garage."
*763 The Attorney General's argument appears to be both logical and dispositive until we carefully examine its underpinnings with a view toward the rules of evidence. In determining whether newly discovered evidence has undercut the prosecution's entire case, we can no more ignore these rules than we could in determining whether something constituted newly discovered evidence in the first place. When we take into account the rules, we find that evidence Ebaniz lured Jones to the garage with the requisite intent is virtually nonexistent.
Both Zavala and Portugal told police of a plot whereby Ebaniz was supposed to lure Jones to the Soto garage. According to Zavala, this was done at Vidal's request. According to Portugal, Jones was to be punished because he had stolen Juan Soto's belongings. Portugal's statement is rife with multiple hearsay, and we have been unable to identify a means by which each level would be admissible. (See Evid. Code, § 1201.) More fundamentally, Portugal's and Zavala's statements to police both were "testimonial" in nature and, hence, "inadmissible unless they came within an exception to the confrontation clause that does not purport to be a surrogate means of assessing reliability." (People v. Parrish (2007) 152 Cal.App.4th 263, 275 [60 Cal.Rptr.3d 868]; see Crawford v. Washington (2004) 541 U.S. 36, 52 [158 L.Ed.2d 177, 124 S.Ct. 1354] (Crawford); People v. Cage (2007) 40 Cal.4th 965, 974, fn. 4 [56 Cal.Rptr.3d 789, 155 P.3d 205] [Crawford applies to all criminal cases still then pending on appeal].)[19] As no such exception exists, neither Zavala's nor Portugal's statement furnishes evidence Ebaniz lured Jones to the garage with the requisite intent.
Ebaniz's own statements to police clearly constitute admissible evidence. They afford only insubstantial support for the notion he aided and abetted or conspired to falsely imprison or assault Jones.
In his first statement, Ebaniz said he and Jones were going to buy some drugs from Gerardo Soto, which Soto said he had at his house. Ebaniz denied knowing anything was going to be done to Jones, and said Soto just showed up at Ebaniz's house on the evening in question, as he did sometimes. Once at the house, someone opened the door. Ebaniz walked in and told Jones to come on. Jones was behind Ebaniz when Ebaniz entered the house, as Jones "never did trust nobody."
In his final statement, Ebaniz said he was standing on the sidewalk by his house, waiting for Jones, who had called and said he was going to come over so the two could "kick it." While Ebaniz was waiting for Jones, who was on *764 foot, Gerardo Soto passed by in a car with Gerardo Zavala. They pulled over when they saw Ebaniz and started talking, then Soto told him to get in the car. They sat there and talked until Jones arrived. When Jones asked where "the shit" was, Ebaniz asked how much money he had, then moved his head in a sign for Jones to get in the car. Later, when Portugal pointed the gun at Ebaniz, Gerardo Soto took the weapon and told Portugal to leave Ebaniz alone. Soto pointed the gun at Jones, then pointed it back at Ebaniz and told him to do what Soto said.
At Ebaniz's first trial, jurors were instructed on various principles of duress. The prosecutor emphasized the many lies Ebaniz had told police as his statement to them evolved, and he suggested that Ebaniz fabricated his story about having a gun pointed at him. The prosecutor argued that someone acting under duress would have run when Jones was shot and would have gone to the police at the first opportunity. The prosecutor asserted that Ebaniz being alive was the biggest exhibit of his guilt, as the people who killed Jones would not have let an innocent witness live. After defense counsel emphasized the duress instructions to the jury, the prosecutor called Ebaniz's story "fanciful," and argued that nobody was sticking a gun in Ebaniz's ear and telling him that if he did not do something to Jones, he would be dead. The prosecutor argued that Ebaniz was willing to torture someone. He also argued that Ebaniz knew at the beginning that Jones was going to be killed, because Jones was told he was already dead, and that Ebaniz never had a gun to his head and never was told he had to tape Jones or move the stick or he would die. The prosecutor said Ebaniz's statement that he was under duress "doesn't appear to be all that trustworthy," and also argued there was no evidence Ebaniz truly was himself beaten. The prosecutor concluded that Ebaniz aided and abetted after it was announced Jones was going to be killed.
(9) In cases involving the separate trials of alleged coparticipants, the California Supreme Court has held that "fundamental fairness does not permit the People, without a good faith justification, to attribute to two defendants, in separate trials, a criminal act only one defendant could have committed. By doing so, the state necessarily urges conviction or an increase in culpability in one of the cases on a false factual basis, a result inconsistent with the goal of the criminal trial as a search for truth." (In re Sakarias (2005) 35 Cal.4th 140, 155-156 [25 Cal.Rptr.3d 265, 106 P.3d 931].) "[T]he People's use of irreconcilable theories of guilt or culpability, unjustified by a good faith justification for the inconsistency, is fundamentally unfair . . . ." (Id. at pp. 159-160; accord, People v. Richardson (2008) 43 Cal.4th 959, 1015 [77 Cal.Rptr.3d 163, 183 P.3d 1146].)
Assuming these principles apply to retrials of a single defendant for the same offenses, the prosecutor did not violate them here, but, contrary to *765 Ebaniz's claim, simply refined and narrowed the theories on which he presented his case. Nevertheless, we are bothered by his suggestion Ebaniz was lying about having been struck and having had a gun pointed at him, when he knew other participants' statements supported Ebaniz's account in this regard. It is improper for a prosecutor knowingly to present false or misleading argument. (People v. Morrison (2004) 34 Cal.4th 698, 717 [21 Cal.Rptr.3d 682, 101 P.3d 568].) Although we reject any attempt by Ebaniz to claim prosecutorial misconduct as such, no objection to the prosecutor's argument having been raised at trial despite the fact trial counsel was aware of the contents of the other statements (see In re Seaton (2004) 34 Cal.4th 193, 198-200 [17 Cal.Rptr.3d 633, 95 P.3d 896]; People v. Turner (1994) 8 Cal.4th 137, 193 [32 Cal.Rptr.2d 762, 878 P.2d 521], overruled on other grounds in People v. Griffin (2004) 33 Cal.4th 536, 555, fn. 5 [15 Cal.Rptr.3d 743, 93 P.3d 344]), we may nonetheless take these arguments into account in determining whether the prosecution's entire case was undercut.
In Ebaniz I, we found the evidence sufficient to demonstrate Ebaniz aided and abetted Jones's false imprisonment. We reasoned that jurors could have rejected Ebaniz's claim of duress, as they were entitled to disbelieve what we labeled his self-serving claims. (Ebaniz I, supra, F042769.) Seriales's testimony calls into fundamental question the prosecutor's assertion Ebaniz was not acting under duress, the basis for jurors' rejection of that defense, and the basis for our affirmance of Ebaniz's convictions for torture, kidnapping, and false imprisonment. The existence of duress calls into fundamental question the basis for finding Ebaniz aided and abetted or conspired to commit assault and false imprisonment, with torture and kidnapping as natural and probable consequences thereof. In our opinion in Ebaniz I, we relied on Ebaniz's participation in Jones's assault as evidence Ebaniz knew of the plan to harm Jones. Even if jurors believed Ebaniz did not initially know of his coperpetrators' intentions, we said, the ultimate plan became clear once the assault began, and Ebaniz still assisted the others. (Ibid.) Thus, we relied on postduress conduct to affirm the convictions, a theory clearly and extensively undercut by Seriales's testimony.
We recognize that Seriales testified that Zavala and someone else told him Ebaniz was the one who brought Jones to the garage, and that Seriales told police Zavala and "the Chalino" (inferentially, Gerardo Soto) said that Ebaniz set Jones up by making the call to get him to come. Assuming the statements concerning Ebaniz's involvement were made in furtherance of the objective of a conspiracy and so fell within the hearsay exception for coconspirator statements (Evid. Code, § 1223), our conclusion does not change. Because Seriales had no personal knowledge of how Jones came to be at the garage or how anything happened before Seriales and Vidal arrived, he could not attest to the credibility of what he was told. By contrast, his testimony significantly bolstered the credibility of Ebaniz's claim that he acted under duress, which *766 in turn bolstered the credibility of his claim that he did not know, prior to being placed under duress, that anything was going to happen, and that his attempt to run when the others began assaulting Jones demonstrated this. Moreover, because Seriales's testimony with respect to duress placed Ebaniz's role in events in an entirely different light than was presented in the first and second trials, even assuming jurors determined Ebaniz got Jones to go to the house with knowledge something was going to happen, Seriales's testimony completely undercut the notion that, under all the circumstances, a reasonable person in Ebaniz's position would or should have known torture and kidnapping were a reasonable foreseeable consequence. (See People v. Nguyen (1993) 21 Cal.App.4th 518, 531 [26 Cal.Rptr.2d 323].)
(10) In sum, the newly discovered evidence completely undercut the prosecutor's theories of aiding and abetting and conspiracy liability, even when supplemented by the natural and probable consequences doctrine, and it pointed unerringly toward innocence. In so holding, we do not fail to recognize or respect the need for finality in criminal prosecutions, or the presumption of correctness given final judgments. We simply decline to set the bar so high that the search for truth becomes a game. Ebaniz has presented new, significant, and credible evidence that he is innocent. Accordingly, he has met the burden required to obtain a new trial on the charges of false imprisonment, torture, and kidnapping, and the related special allegations.
At oral argument, the Attorney General asserted that if habeas corpus relief is granted, the proper remedy is a remand for an evidentiary hearing in order for a magistrate to make credibility determinations and factual findings, rather than reversal. California Rules of Court, rule 4.551(f), upon which the Attorney General relied in part, applies to habeas corpus proceedings in the superior, not appellate, court. (See Cal. Rules of Court, rule 4.550(a).) Moreover, such a remedy would deprive Ebaniz of his right to have a jury make the ultimate determination of credibility, despite the fact that, in order to obtain habeas corpus relief in the first instance, he has necessarily already established that we can have no confidence in the verdict unless and until a jury has evaluated the new evidence he has presented. One jury has already found Seriales's testimony to be credible. The appropriate remedy in this case is reversal of the judgment and a new trial.

DISPOSITION
Ebaniz's petition for writ of habeas corpus is granted, and the judgment of the Tulare County Superior Court in People v. Tyrone Ebaniz, Nos. 69782 and 89872, is vacated except insofar as it provides for an acquittal of murder. Upon finality of this opinion, the Clerk/Administrator of the Court of Appeal, *767 Fifth Appellate District, shall remit a certified copy of this opinion and order to the Tulare County Superior Court for filing, and the Attorney General shall serve another copy thereof on the prosecuting attorney in conformity with Penal Code section 1382, subdivision (a)(2). (See In re Jones (1996) 13 Cal.4th 552, 588 [54 Cal.Rptr.2d 52, 917 P.2d 1175].)
Wiseman, J., and Gomes, J., concurred.
NOTES
[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part I of the Discussion.
[1] In light of our conclusion that Ebaniz's convictions must be reversed, we do not address his claims of sentencing error.
[2] By separate orders, we have taken judicial notice of our records and opinions in Ebaniz's prior appeals (People v. Ebaniz (Sept. 21, 2004, F042769) [nonpub. opn.] (Ebaniz I); People v. Ebaniz (Sept. 28, 2006, F047859) [nonpub. opn.] (Ebaniz II)), the appeal of Keith Seriales (People v. Seriales (Nov. 1, 2007, F049062) [nonpub. opn.]), and the appeal of Gerardo Zavala (People v. Zavala (2008) 168 Cal.App.4th 772 [85 Cal.Rptr.3d 734]).
[3] All statutory references are to the Penal Code unless otherwise stated.
[4] Pursuant to section 1118.1, the trial court dismissed the special circumstance allegations at the close of the People's case.
[5] Specifically, our disposition stated: "The judgment of conviction on count one, first degree murder (§ 187), is reversed. The judgments of conviction on the remaining counts are affirmed. The district attorney shall have 30 days after the remittitur is filed in which to give notice of his intent to seek retrial on count one. If the district attorney gives such notice, the court shall proceed accordingly. If the district attorney fails to give such notice, the court shall resentence [Ebaniz] on the remaining counts." (Ebaniz I, supra, F042769.)
[6] Our opinion affirming Seriales's convictions, but vacating sentence and remanding for resentencing, was filed on November 1, 2007. Seriales testified on November 19, 2007, despite his attorney's advice that he not testify because his appeal process had not been concluded.
[7] The prosecutor argued that a conspiracy was in effect and Ebaniz was part of it, but he specifically told jurors that he was proceeding under an aiding and abetting theory, and not a conspiracy theory.
[8] Although this was a correct statement of the law, we note that the circumstances indicating duress nevertheless remained relevant to whether Ebaniz acted with a particular intent. (See People v. Anderson (2002) 28 Cal.4th 767, 779-780 [122 Cal.Rptr.2d 587, 50 P.3d 368].)
[9] In our order directing that an order to show cause issue, we granted the parties leave to file a return or reply to the return, as applicable, or instead to elect not to file further pleadings and to stand on their informal response or reply, with the agreement that we could decide the issues based on the informal briefing.
[*] See footnote, ante, page 743.
[12] Although we will discuss some of Ebaniz's claims of unfairness and prosecutorial overreaching, post, other of his arguments on the subject could have been raised in Ebaniz I. As habeas corpus will not serve as a substitute for an appeal (In re Dixon (1953) 41 Cal.2d 756, 759 [264 P.2d 513]), an unjustified failure to present an issue on appeal generally precludes consideration of that issue in a postconviction habeas corpus proceeding (In re Harris (1993) 5 Cal.4th 813, 829 [21 Cal.Rptr.2d 373, 855 P.2d 391]). This said, we reject the Attorney General's argument that Ebaniz's prosecutorial misconduct claims are barred for failure to raise them in his current appeal. Whatever validity this argument might have had had Ebaniz again been convicted of murder, it is patently meritless in the face of Ebaniz's acquittal on the only count that could have been the subject of that appeal.
[13] Even with respect to Ebaniz's third trial, Seriales's reluctance to testify before his own case was final was evident, as the record in that case shows he did not decide that he would indeed testify, against his attorney's advice, until at or near the conclusion of the prosecutor's case-in-chief.
[14] We discern no other hearsay exception under which the statement was potentially admissible, and the Attorney General identifies none.
[15] Although the passage just quoted refers to a hearing on habeas corpus, nothing in the opinion suggests the court's definition of what constitutes new evidence is limited to the preliminary determination of whether to issue an order to show cause or hold an evidentiary hearing.
[16] That Portugal's statement to police was admitted at Ebaniz's second trial does not alter our conclusion. Portugal's admission that he pointed a gun at Ebaniz was specifically disserving to his own interests, and thus qualified as a declaration against penal interest under Evidence Code section 1230.
[17] The possibility of reduced culpability, as opposed to complete innocence, appears to have arisen for the first time in People v. Gonzalez (1990) 51 Cal.3d 1179, 1246 [275 Cal.Rptr. 729, 800 P.2d 1159] (Gonzalez). The Attorney General argues that Gonzalez's holding arose in a capital case, and that the issue of reduced culpability only has application in such cases, where, pursuant to section 190.3, juries may resolve factual issues of a defendant's level of culpability in rendering the proper penalty. In noncapital cases, the argument runs, the issue of reduced culpability has no application, because either a defendant is a principal to a crime under section 31 or he or she is not.

We are not persuaded. Gonzalez distinguished between the import newly discovered evidence must have at the guilt phase (to wit, undermine the entire prosecution case and point unerringly to innocence or reduced culpability) and what its import must be in order to disturb a penalty judgment (to wit, so clearly change the balance of aggravation against mitigation that its omission more likely than not altered the outcome). (Gonzalez, supra, 51 Cal.3d at p. 1246.) We can readily conceive of situations in which newly discovered evidence would point unerringly to innocence of a greater offense without completely exonerating a defendant. For instance, a defendant convicted of premeditated murder might seek to use newly discovered evidence to prove that he or she killed upon a sudden quarrel or heat of passion and so, while not entitled to an acquittal, was guilty only of voluntary manslaughter. While we see no reason to preclude habeas corpus relief under such circumstances, we need not decide the issue here.
[18] Although Ebaniz initially minimized his knowledge of events, he never wavered from his claims that he tried to run when the assault on Jones started, only to have an AK-47 pointed at him, and that he was struck in the mouth when he refused to stab Jones with the screwdriver. Once he admitted being present throughout the incident, he also consistently claimed his participation was forced and that he vomited on one occasion. At one point, he told Sergeant Logue: "Well, you got an AK to your head, what are you gonna do? You tape him or you don't . . . [¶] . . . [¶] Well not to my head but they're . . . they're feet away from me just pointing it at me saying you're gonna do it or just basically you're gonna get shot."
[19] Crawford was decided on March 8, 2004. We filed our opinion in Ebaniz I on September 21, 2004.